IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 17, 2014 Session

IN RE A.S.C.


Appeal from the Circuit Court for Sevier County
No. 2011-A017-II     Rex Henry Ogle, Judge

_____

No. E2013-01830-COA-R3-PT-FILED-AUGUST 29, 2014

_____

This is a termination of parental rights case concerning A.S.C. ("the Child"), the son of
A.G.S. ("Mother") and C.D.T. ("Father").  Mother and Father were never married.  Two
years after the Child was born, Mother, as the sole plaintiff, filed a petition to terminate
Father's parental rights based on his alleged abandonment of the Child.  After Mother and
C.R.S. ("Stepfather") were subsequently married, Mother filed a motion to join Stepfather
and an amended petition to terminate Father's rights and allow Stepfather to adopt the Child.
Father objected and filed a counterclaim in which he requested that he be designated as the
alternate residential parent and granted traditional visitation rights.  After a bench trial, the
court terminated Father's rights based on its finding, said to be made by clear and convincing
evidence, that multiple forms of abandonment exist.  The court further found, also by clear
and convincing evidence, that termination was in the best interest of the Child.  Father
appeals.  He challenges the four-month period of time used to establish abandonment by
failure to visit or support the Child; the sufficiency of the evidence of grounds for
termination; and the trial court's best-interest determination. We conclude that the trial court
erred in its calculation of the four-month period for consideration of abandonment pursuant
to Tenn. Code Ann. § 36-1-102(1)(A)(i)(2010).  As a result, we vacate the trial court's
finding of abandonment by failure to provide child support as a ground for termination.  In
all other respects, the judgment is affirmed.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which JOHN W.
MCCLARTY  and THOMAS R. FRIERSON, II, JJ., joined.

P. Richard Talley, Dandridge, Tennessee, for the appellant, C.D.T.

Heather N. McCoy, Sevierville, Tennessee, for the appellees, A.G.S. and C.R.S.

Jeffrey L. Stern, Sevierville, Tennessee, Guardian ad litem.[1]

## OPINION

### I.

In 2008, Mother and Father worked together at the Dixie Stampede, an entertainment venue in Sevier County. At that time, Mother lived at home with her parents. They dated only a few times before Mother became pregnant; Mother described their relationship as a "fling thing." The Child was born in March 2009.

At trial, Mother testified that when she shared the news of her pregnancy with Father, he "was not happy and did not speak to [her] for a while." At one point, Mother said Father informed her that he and his girlfriend had decided "it would be for the best" if Mother had an abortion. For his part, Father, then 37,[2] testified that it was Mother's body and that he had asked her if she wanted to consider adoption or abortion. During the pregnancy, Mother talked with Father and tried to get him involved but said Father "just didn't really seem interested after that." Mother convinced Father to meet her outside in the parking lot at work – she wanted to show him photographs of the Child's ultrasound and let him know the baby was a boy. She testified that once outside, Father kept her waiting while he stood around talking with a group of friends. Father never came over, so Mother finally approached him. Mother said she asked, "[D]on't you want to see it?" Mother said Father was "kind of like yeah, whatever, just didn't care." While Mother was still pregnant, a co-worker of the Child's maternal grandmother offered to hold an informal "mediation" between Mother and Father to go over both parents' responsibilities with respect to the Child. Mother testified that Father was very upset after the mediation – he said "that stuff is not fair . . . , that he shouldn't be obligated to do all that type of thing," and felt he was being "targeted. " Father declined to participate in a second mediation. Their interactions led Mother to conclude that Father had no interest in being involved with the Child.

For his part, Father agreed "there wasn't a lot of communication with us," but said he did talk with Mother at work during the pregnancy. Father said that after Mother decided to

---

[1]The Guardian ad litem adopts the brief and reply brief filed by Father in their entirety. The Guardian ad litem requests that this Court reverse the order terminating Father's parental rights.

[2]The record does not reflect Mother's age. At trial, Father agreed that she was "quite younger" than him.

have the baby, they talked about going for an ultrasound and he was interested in that. Father continued: "I can remember multiple times coming up and rubbing her belly, calling him peanut." At one point, Mother had to be hospitalized for over a week with pre-term labor. She said she informed Father, but he did not come to see her and never offered to help with medical care. Father denied knowing that Mother was hospitalized.

During the pregnancy, the Child's paternal grandmother, P.S., took Mother shopping at Babies R Us. Father was supposed to come, but did not. According to Mother, P.S. bought her a baby stroller, but spent the entire time trying to convince Mother that she should let Father's girlfriend be a part of the Child's life.

Father testified that he learned from his girlfriend that Mother had gone to the hospital for the birth of the Child. Just after the Child was born, Father went to the hospital to see him. Mother let Father hold the Child and take pictures. Father had no other visits with the Child. By that time, Father was unemployed. He did not provide health insurance or any support for the Child. Mother supported the Child. The Child had health insurance through TennCare. When the Child was two weeks old, P.S. and her husband visited the Child again. Mother testified that P.S. took pictures and commented that the Child did not look anything like Father. At trial, P.S. testified that she and Father had both made efforts to participate in the Child's life and to see him. She noted that she had seen the Child at the hospital and two other times at Mother's home. She admitted that Mother had never told her she could not visit the Child, but described her few visits as "uncomfortable" for everyone.

In late 2009, when the Child was some six months old, the Department of Human Services ("DHS") brought a child support action against Father. Around the same time, Father and P.S. saw a family law attorney who provided them with a form parenting plan. They drove to Mother's house and P.S. delivered the blank form plan to Mother. After that visit, P.S. did not visit or ask to visit again. Neither Father nor P.S. disputed Mother's testimony that she never told them that they were not welcome to see the Child. Father acknowledged he never sent the Child anything – no clothes, a birthday card or a Christmas gift.

Mother, in her sole name, filed a petition to terminate Father's rights on April 18, 2011. Father responded with a handwritten "note" that asserted he was "contesting this case against me."

On June 24, 2011, Mother married Stepfather. On June 27, 2011, Mother and Stepfather filed a motion to join Stepfather in the pending action and a motion for permission to file an "Amended Petition to Terminate Parental Rights and for Adoption by a [Stepparent]," with the Amended Petition attached. On August 31, 2011, Mother moved

for a default judgment based on Father's failure to plead or otherwise make a proper defense. In his September 29, 2011 response, Father filed a counterclaim in which he requested that he be designated as the Child's "alternate residential parent" and submitted a proposed parenting plan providing him with standard visitation every other weekend and one evening during the alternating weeks. Father objected to the proposed adoption of the Child and asserted that he would be prejudiced if the court allowed the Amended Petition to be filed without a hearing on the matter. In August 2012, the parties attended a mediation session. It was not successful. On October 5, 2012, following a hearing, the trial court entered an agreed order allowing Mother and Stepfather to file and proceed on the Amended Petition and joining Stepfather as a party. On March 4, 2013, the Amended Petition was filed.

After her marriage, Mother and the Child moved out of her parents' home and into a home with Stepfather. Mother testified to the close relationship between Stepfather and the Child and the many activities they shared. She described theirs as a "normal father/son relationship." They fished together, Stepfather read bedtime stories to the Child and the Child was excited when Stepfather returned home from work each day. Stepfather's grandparents, who live in Jacksboro, are also a part of the Child's life. In early 2012, Mother and Stepfather had a child together, another son. At the time of trial, the Child was four and his half-brother was eleven months. Mother described them as "best buddies."

Mother testified that, in the beginning, she tried to involve Father in the Child's life but to no avail. Now, years later, she was pursuing termination of Father's rights in trying to do what she felt was best for the Child.

After the trial, the court terminated Father's rights to the Child based on its finding of multiple forms of abandonment. More specifically, the court found that Father willfully failed to provide child support or visit the Child in the four months immediately preceding the filing of the original petition to terminate, and that he willfully failed to make reasonable payments toward Mother's support in the four months immediately preceding the birth of the Child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (iii). Father filed a timely notice of appeal.

II.

Father presents the following issues as taken verbatim from his brief:

> 1. Whether, in determining whether Father abandoned the child, the trial court erred in using the four-month period preceding the filing of the original Petition.

-4-

2. Whether the trial court erred in terminating Father's parental rights on the basis of his failure to pay child support.

3. Whether the trial court erred in terminating Father's parental rights on the basis of his failure to visit the child.

4. Whether the trial court erred in terminating Father's parental rights on the basis that it was in the best interest of the child.

III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at *11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

"As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise." *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004); Tenn. R. App. P. 13(d). "We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights." *Id*. Great weight is accorded the trial court's determinations of witness credibility, which court findings will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no

-5-

presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741 (Tenn. 2002). On our review, we proceed mindful that only a single ground must be sufficiently proven to justify termination. ***In re Audrey S.***, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

A.

Father challenges the termination of his parental rights, said termination being pursuant to Tenn. Code Ann. § 36-1-113(g)(1)(Supp. 2013). That section provides grounds for termination whenever any of the specified forms of "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred. In turn, Section 36-1-102 defines "abandonment," in relevant part, as follows:

> (1) (A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
> * * *
>
> (iii) A biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i), (iii). Father's argument is essentially two-fold: First, he asserts that the trial court incorrectly computed the four-month period for purposes of establishing abandonment under Section 36-1-102(1)(A)(i). Second, he contends that the evidence does not clearly and convincingly show that his failure to visit or support the Child was willful. We address these issues in turn.

-6-

B.

Father first argues that the trial court incorrectly used the four-month period preceding the filing of the original termination petition by Mother alone rather than the time period preceding the filing of the amended petition, for the purpose of considering abandonment by failure to support or visit the Child. Father's argument has merit as to the support issue.

As we earlier noted, Mother initially filed a petition to terminate on April 18, 2011. Following her marriage to Stepfather, she filed, on June 27, 2011, a motion to join him in the pending action and a motion for leave to file an amended petition to terminate and to allow adoption by Stepfather ("Amended Petition"). On October 5, 2012, the trial court entered an agreed order granting the motions. Inexplicably, the Amended Petition was not filed until March 4, 2013, the day before trial.

At the outset of trial, the issue of which four-month period was applicable to the allegations of abandonment pursuant to Section 36-1-102(1)(A)(i) was briefly discussed:

> The Court: What statute are you proceeding under, Ms. McCoy?
>
> Ms. McCoy [Counsel for Mother and Stepfather]: On the grounds of abandonment, Your Honor. That child support was not paid for four months preceding the filing of [t]his petition. In addition, that [Father] did not visit for the four months preceding filing this petition.
>
> \* \* \*
>
> Mr. Talley [Counsel for Father]: He's been paying by court order for --
>
> \* \* \*
>
> – for two and a half years.
>
> \* \* \*
>
> Ms. McCoy: [T]he grounds after the petition is filed cannot be cured. And the fact of the matter is four months preceding the petition he had not visited nor had he paid child support.

-7-

* * *

> Mr. Stern [Guardian ad litem]: [J]ust to throw my two cents in on that, to me the issue is going to be the four month period because an initial termination petition was filed by the mother against the father, then I got appointed. It's my understanding that one parent cannot terminate on the other parent. Subsequent to that . . . an amended petition was filed including the mother's husband, stepfather, to where he's the one actually seeking to terminate the father's rights. So my contention would be that the four month period we need to look at needs to be from the amended petition, not the original petition, as to dad's efforts to visit or failure to visit and the support.

> Ms. McCoy: [T]his is an amended petition filed under Rule 15 of the Rules of Civil Procedure so, therefore, all of the grounds relate back to the time of the initial petition being filed.

> The Court: I knew that's what your argument was going to be.

Ultimately, Mother's position prevailed. In its termination order, the trial court found that Father "willfully failed to support or visit with the minor child for four (4) consecutive months or more immediately preceding the filing of the proceeding to terminate parental rights. . ." and that "the Amended Petition relates back to the filing of the original Petition pursuant to Rule 15 of the Tennessee Rules of Civil Procedure." As a result, the trial court considered Father's conduct during the four-month period immediately preceding the filing of Mother's original petition in April 2011.

In our view, however, the Guardian ad litem got it exactly right. In this state, the termination of a biological parent's rights to a child is governed by statute. In this regard, Tenn. Code Ann. § 36-1-113(b) provides the following parties with standing to file a parental termination petition: "[t]he prospective adoptive parent or parents, including extended family members caring for a related child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, or the department. . . . As can be seen, the statute does not grant one parent the authority to alone seek termination of the other parent's rights, and the Supreme Court has expressly so held. *See* **Osborne v. Marr**, 127 S.W.3d 737 (Tenn. 2004). In the present case, Mother clearly lacks standing to file a petition to terminate Father's rights by herself. Therefore, the original termination petition she filed in April 2011 is null and void. As we see it, it follows that Tenn. R. Civ. P. 15.03 providing for the "relation back" of amendments to the filing of an original pleading is not applicable. Simply

-8-

stated, there can be no "relation back" to a pleading – in this case, the original petition by Mother – that was a nullity from the start. Moreover, as Father correctly asserts, the Supreme Court has further observed that "[b]ecause the legislature specifically designated who may file a petition to terminate parental rights, a court does not have subject matter jurisdiction to hear such a petition unless the party filing the petition has standing." Based on the foregoing, the original petition to terminate is a nullity – ineffectual for all purposes.

Father reasons that the four-month period from November 4, 2012, until the filing of the Amended Petition on March 4, 2013 is the applicable statutory period. We conclude that he is correct. In *In re D.L.B.*, 118 S.W.3d 360 (Tenn. 2003), the Supreme Court had to consider the proper calculation of the four-month period for purposes of considering a parent's abandonment by non-support and/or failure to visit under Section 36-1-102(1)(A)(i). In that case, DCS took custody of a minor child as a result of the mother's drug use during her pregnancy; the child immediately entered foster care. In May 2000, CASA filed a petition to terminate parental rights against the child's mother and her husband. Early in her pregnancy, however, Mother had advised a Mr. Moore, with whom she also had a relationship, that she believed him to be the biological father. Later, the juvenile court granted CASA leave to amend the petition to include Mr. Moore. Subsequently, Mr. Moore's paternity was confirmed and he began visiting the child and paying child support as ordered. CASA filed an amended petition naming Mr. Moore. In May 2001, the juvenile court dismissed the amended petition. Meanwhile, in January 2001, the Nickelsons, the foster parents/prospective adoptive parents, filed a petition in the chancery court to terminate Mr. Moore's rights and to adopt the child. *Id*. at 363-64. After a trial, the court terminated Mr. Moore's rights. On appeal, this court affirmed.

On second-tier appellate review, the Supreme Court observed: "[I]t is clear that during the four months preceding the Nicklesons' filing of the petition to terminate parental rights, Mr. Moore paid child support and visited with [the child]. The chancery court and Court of Appeals, however, relied upon Mr. Moore's failure to pay child support or visit with D.L.B. in the four-month period preceding the filing of CASA's May 2000 petition to terminate parental rights." *Id*. at 365. The High Court concluded this was error and reversed the decision. The Court held as follows:

> [T]here is no indication that the legislature intended that conduct
> occurring prior to dismissal of an earlier petition to terminate
> parental rights that was brought by one party should be used as
> a ground for terminating parental rights in a subsequent
> proceeding initiated by another party. Accordingly, we hold that
> only a parent's conduct in the four months immediately
> preceding the filing of a petition then before the court may be

used as grounds to terminate parental rights under Tennessee Code Annotated section 36-1-102(1)(A)(i). Since there is no dispute that Mr. Moore paid child support and visited [the child] in the four months immediately preceding the petition filed in the chancery court by the Nicklesons, the lower courts erred in terminating Mr. Moore's parental rights based upon Tennessee Code Annotated section 36-1-102(1)(A)(i).

*Id*. at 366.

In the present case, Mother acknowledges ***In re D.L.B.***, but concludes that it is not applicable because Mother's original petition was never dismissed. We disagree. In our view, the Court's holding – "that Tennessee Code Annotated section 36-1-102(1)(A)(i) requires that the willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the petition currently before the court," *see **id*.*, – applies not only in the context of a dismissed, earlier-filed petition to terminate, but more broadly to other situations involving the filing of multiple petitions to terminate against the same party. Here, we have already concluded that Mother's original petition is null and void. In effect, the situation is the same as if the original petition was dismissed. Accordingly, consistent with ***In re D.L.B.***, the applicable four-month period is the four months immediately preceding the filing of the Amended Petition. The trial court erred in concluding otherwise.

C.

We consider the evidence regarding Father's payment of child support in the four months from November 4, 2012 until March 3, 2013, the day before the Amended Petition was filed. The proof showed that Father was ordered to pay child support of $350 per month beginning in February 2010. He made a first, voluntary partial payment in June 2011. By the time trial was held in March 2013, Father had paid his child support in full each month since July 2011. On the facts before us, we conclude that the trial court erred in terminating Father's rights for failure to pay child support pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i). Accordingly, we hereby vacate this ground for termination.

D.

The trial court terminated Father's rights for failure to visit the Child, also under Section 36-1-102(1)(A)(i). Again, the trial court incorrectly considered the same four-month period preceding the filing of the original petition in finding that this ground of abandonment was proven. As to this ground, however, we conclude that the erroneous calculation is of no consequence. Father does not dispute the fact that he has visited the Child only once – in the hospital at the time of the Child's birth. Instead, Father's proof was focused on his contention that his failure to visit was not wilful.

P.S. testified that Father had made efforts to be involved with the Child and she had worked with him. At first, Father had no rights because he was not named on the birth certificate. P.S. said she was the one who put visitation with the Child "on hold" until after Father's parentage could be confirmed, which took much longer than they had hoped. P.S. said she and Father were "very close," and he had told her of his attempts to reach out to Mother with respect to seeing the Child up until the termination proceedings began. P.S. stated: "He would come to me and tell me that he had e-mailed or gone through a friend or all these different things and the answer was always no." P.S. noted that she had not herself tried again to visit the Child because she had "the real impression that we were going through this whole court process to make that happen." As a result, she had no reason to advise Father that he needed to do more or something different regarding visitation. P.S. testified that Father had talked with Mother and believed things were moving forward regarding the Child, but then "the game changes. . . ."

Father further testified he made other efforts to see the Child. He said once, when the Child was nine or ten months old, he went to Mr. Gatti's where Mother and the Child were attending another child's birthday party. When Father saw them through a window, Mother covered the Child, retreated to a corner, and declined to come outside and speak with him. After that, Father's efforts at "trying to get something together" with respect to the Child were mostly limited to communicating with Mother or her friends via Facebook. Later, after Father obtained DNA results, he and P.S. visited a family law attorney who provided them with a form parenting plan. P.S. and Father drove directly to Mother's house, and P.S. gave the plan to Mother. Father said he stayed in the car because he had "heard through the grapevine that her brothers weren't very happy" with him. At some point in the spring of 2010, Father said he and Mother had a lengthy, amicable phone conversation in which he begged Mother to let him see the Child. A few days later, when he had not heard back from Mother, he tried to call again and she had changed her phone number. He said once Mother changed her number, "that was pretty much it."

Regarding his right to have contact with the Child, Father conceded that even while Mother was still pregnant, he was made aware that if he and Mother couldn't reach an agreement, he would "need to file something" and "at some point [he] would have to go to court." He admitted he never took any action. Asked what other efforts he made to see the Child since the termination proceedings began, Father said he made none because after Mother married and moved out of her parents' house, he had no contact information and "didn't even know if she still worked at Dixie Stampede or not." On this point, Mother testified that she continued to work at Dixie Stampede, as she had for over nine years, and Father knew how to reach her. Mother acknowledged that, early on, Father would call and say that he had diapers for the Child and would bring them by or that he would say he was coming to visit, but never followed through.

Before this Court, Father insists that his lack of contact with the Child cannot be deemed willful. The trial court was unconvinced, as are we. The court found, in relevant part, as follows:

> [I]t's uncontradicted that in this child's life the father has only seen this child one time. [H]e and others testified about maybe the reasoning and I don't question the reasoning; however, the father . . . was told early on by [DHS] that he would have to file a petition . . . .
>
> So it is clear to the Court that even though at times there were negotiations going on back and forth or at least on one side, . . . there is no doubt that for a period . . . from the child's birth until this action was filed the father filed no petition to see this child or anything like that. And so it is clear to the Court, unfortunately, . . . that he has not had any visitation, has not sent things to the child at Christmas or birthdays. And Facebook communications, folks, . . . are not a legal substitute for complying with the law. [A]nd it's uncontradicted, that the father was never told he couldn't visit. But again, he was told, by his own admission, that [DHS] told him that he would have to file a petition for visitation. And as in many cases, . . . often times the grandparents or other family members are more concerned sometimes than the actual parents of the children. Even support by grandparents is not a legal substitute for support and contact by the parent.

*    *    *

> [R]egretfully, but with clear and convincing evidence, [Mother and Stepfather] have proven . . . that the child . . . has been abandoned by the father . . . .

The evidence preponderates strongly in favor of a finding that Father willfully failed to visit the Child in the relevant months before the Amended Petition was filed. The trial court properly terminated Father's rights on the ground of abandonment pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i) for his failure to visit the Child.

E.

The trial court terminated Father's rights on the ground of abandonment under subsection (iii) of Tenn. Code Ann. § 36-1-102(1)(A) in that he "failed to make reasonable payments toward the support of [Mother] . . . for four (4) consecutive months immediately preceding the birth of the Child." In considering this form of abandonment, the relevant four month-period is November 23, 2008 until March 22, 2009. The Child was born on March 23, 2009.

Before this Court, neither party specifically addresses this ground for termination; instead, they focus only on the alternate grounds of abandonment by failure to support and failure to visit the Child under Tenn. Code Ann. § 36-1-102(1)(A)(i). Moreover, Mother confusingly asserts that she pursued termination based on abandonment under subsection (iii), "and the trial court did find that Father had abandoned the minor child by willfully failing to visit or support the minor child for the four . . . months preceding the filing of the original Petition." This is provided under subsection (i). In any event, we have considered the evidence in light of the court's finding of abandonment under Section 36-1-102(1)(A)(iii).

At trial, Father admitted that he provided no financial support to Mother during her pregnancy. As to whether his conduct was wilful, the proof showed that Father and Mother continued to work at Dixie Stampede after Mother became pregnant. Before the Child was born the following year, however, Father was unemployed. Father testified that 2009 was a "horrible year" for him, and he was unemployed for "a good eight months." At the same time, Father admitted that the reason he was without income at that time was because he was fired from Dixie Stampede for "failing to show up." Further, Father admitted that while he looked for another job, he was able to do construction work for his stepfather "to keep food in [his] mouth."

On our review, the evidence does not preponderate against the trial court's finding of clear and convincing evidence of abandonment based on Father's wilful failure to provide any support to Mother in the months before the Child was born. The trial court did not err in terminating Father's rights on the ground of abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(iii).

V.

Father challenges the trial court's best-interest determination. He asserts that the trial court essentially found that the Child would be "better off" if Father's ties to him were severed, rather than finding that Father had forfeited his parental rights by failing in his parental responsibilities to the Child. Father concludes: "Notwithstanding [Stepfather's] intentions to provide a stable and nurturing environment for the [C]hild by adopting him, the trial court erred in terminating Father's parental rights based simply on the benefits to the [C]hild from such an outcome."

In considering the "best interest" issue, we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i)(Supp. 2013). That section provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

-14-

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dept of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App. Sept. 15, 2006)).

We quote pertinent portions of the trial court's best-interest analysis:

[I] could go through and cite you case after case here but you all know that, counsel, . . . it is in the best interest of the child because he – the child has established an obviously good relationship with the stepfather, that there appears to be a lot of love there. And while I don't discount the fact that the father in this case may love his child . . . , the bottom line is that, and I say, he has legally abandoned the child. . . .

* * *

> And so the Court must find those [termination] factors and I do
> find likewise that it is in the best interest of the child that the
> parental rights of the father herein be terminated and that based
> upon the testimony . . . that the stepfather . . . be allowed to
> adopt this child.

At trial, Father said that during 2011, after a DUI conviction, he was diagnosed with ADHD and dyslexia. After he began taking new medications, "it was pretty much overnight that everything simply started working out right. . ." He admitted, however, that he could not have passed a drug screen as recently as January 2012. Father said he had been employed in sales for U.S. Cellular for nearly two years and lived in an apartment, with roommates, for almost three years. Father described his life as "fantastic" and said the only thing really missing was contact with the Child.

P.S. testified in the last few years, Father had become the son she knew he could be. She said, in earlier years, he had been in a "negative place" and had gone through a lot. She took him to see a doctor who prescribed an anti-depressant. As time went on, she couldn't understand why Father, a "bright" person, "couldn't put his own life together." Eventually, during 2010, they saw other doctors who opined that Father's ADHD and social anxiety had been misdiagnosed. According to P.S., Father's new medication "changed his life." She said that Father was able to work now and take care of himself – he shared a place with roommates and paid his own rent and bills. She could not say, however, that he could pass a drug screen at the time of trial. P.S. acknowledged that Father had problems and had made some mistakes, but suggested they were in the past. She described him as a loving son, and an "excellent person" with a family that desperately wanted the Child in their lives. P.S. concluded that Father was capable of looking out for the Child, and that his family was also available to assist him. P.S. introduced a July 2012 letter sent from Father's attorney to Mother, at P.S.'s request, which expressed her desire not to interfere, but to foster a relationship with the Child.

In summary, the proof showed that Father had no relationship with the Child. Although Father testified he tried to make contact and work with Mother, his efforts to make sure that he saw the Child were seemingly half-hearted, unofficial, and infrequent, at best. As the trial court emphasized, Father to the time of trial, has had "only token contact, one

-16-

contact since the child has been alive. . . ." Mother held the view that, at this point, it would be "devastating" to the Child if Father entered his life. She continued:

> "[Stepfather] is the only father that he knows and to suddenly be told he's not your daddy, this guy is, it would be just traumatic for him. He wouldn't understand. [H]e's doing so well. He's going to be entering preschool soon and to suddenly have this all thrown at him it would just be devastating."

Like the trial court, we do not doubt that Father has love for the Child and would like to spend some time with him. At the same time, months, then years have passed while Father did nothing to build any relationship with his son. During most of that time, Stepfather literally "stepped up" and became a parent to the Child in every sense of the word. Nothing in the record before us convinces that the Child's world should be turned upside down at this point for Father's benefit. Looking at the situation from the perspective of the Child, as the law requires, we conclude that the evidence clearly and convincingly supports the trial court's findings in support of its determination that the Child's best interest is served by permanently severing the rights of the "father" he has never known.

VI.

As an additional issue, Mother asserts that Father's appeal should be dismissed for failure to comply with Tenn. R. App. P. 8(A). That rule governs appeals as of right in parental termination cases and provides, in relevant part, that a notice of appeal in a termination of parental rights proceeding "shall indicate that the appeal involves a termination of parental rights case." Mother correctly notes that, in the present case, Father's notice of appeal indicates only that it is a "civil" action.

This Court's case file reflects that Father filed a timely notice of appeal on August 12, 2013. The notice, although incorrectly designating the case as civil, correctly listed other identifying information – the parties, the date of the judgment being appealed, the trial court, the trial judge, and the trial court case number. The notice of appeal reflects that a copy was sent to Mother's counsel on the same day it was filed. Ultimately, the appeal was properly docketed in this Court as a parental termination case and proceeded accordingly. Mother claims no apparent prejudice as a result of the technical error by Father, and we find none. Accordingly, the requested relief is hereby denied.

## VII.

The judgment of the trial court is affirmed as modified. That portion of the judgment terminating Father's parental rights on the ground of abandonment by failure to provide child support pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i) is vacated. In all other respects, the judgment terminating Father's parental rights is affirmed. Costs are taxed to the appellant, C.D.T. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE