**STATE of Tennessee DEPARTMENT OF CHILDREN'S SERVICES**

v.

**B.J.N.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

June 19, 2007 Session.

Aug. 8, 2007.

Permission to Appeal Denied by Supreme Court Nov. 13, 2007.

Michael G. Hatmaker, Jacksboro, TN, for the Appellant, B.J.N.

Robert E. Cooper, Jr., Attorney General and Reporter; and Douglas Earl Dimond, Senior Counsel, Nashville, TN, for the Appellee, State of Tennessee Department of Children's Services.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

The State of Tennessee Department of Children's Services ("the State") filed a petition seeking to terminate the parental rights of B.J.N. ("Mother") to the minor child R.S.N. ("the Child")[1]. The Juvenile Court entered an order terminating Mother's parental rights to the Child based upon the grounds found in Tenn.Code Ann. §§ 36–1–113(g)(2) and (g)(3). Mother appeals to this Court. We affirm the termination of Mother's parental rights to the

1. The instant case was consolidated with a case seeking to terminate Mother's parental rights to another minor child. However, Mother did not contest the termination of her rights as to this other child and this other child reached the age of majority prior to the final day of trial.

Child under Tenn.Code Ann. § 36–1–113(g)(3).

### Background

The case now before us involves the youngest of Mother's five children. Mother had four boys and one girl. All five of Mother's children were taken into State custody at different times while they were minors. Three of the five were adults when the petition to terminate Mother's parental rights as to the Child was filed. Of these three, the two boys were raised in foster care. Mother's rights as to her daughter, the other adult child, were terminated when the daughter was an infant and Mother's daughter was subsequently adopted. Of the two youngest of Mother's children, one was raised in foster care and achieved the age of majority during the pendency of this suit. Thus, Mother currently has only the one child who still is a minor.

The Child, who has asthma, a heart murmur, and developmental delays due to a premature birth, was taken into State custody and placed in foster care in 2001 due to dependent/neglect issues and alleged sexual abuse by one of Mother's boyfriends. The foster family that the Child currently resides with is the same foster family that the Child's three older brothers lived with during the majority of their time in State custody.

Mother testified at trial that her daughter was taken into State custody because "[s]he was abused by my ex-husband," and Mother admitted that she failed to protect her daughter from the abuse. Mother admitted that she recently took out an order of protection against "an ex-boyfriend from Chicago" who has lived in this area for approximately three years and that in the past her relationships with men were a cause of concern for the safety of her children. Mother admitted that over the years, the State attempted on different occasions to place her children back into Mother's home, but that the children subsequently were taken back into State custody because Mother had "[n]o electric, no heat, no food." The Child was returned to Mother's home at one point for a trial home placement, but later was taken back into State custody.

Dr. Gary B. Verna testified as an expert at trial concerning his parental assessment of Mother. Dr. Verna had several sessions with Mother and administered several psychological tests, "[t]wo of which assess cognitive functioning and one of which is a personality assessment and a forth, which is a parenting stress index or a parenting assessment." Dr. Verna also completed a seven-page evaluation including recommendations regarding Mother's ability to parent the Child.

Dr. Verna testified about his evaluation and recommendations stating:

> The recommendation I made was that I did not feel that the resources required for her to be successful in parenting this child who, himself, has special needs, were sufficient for her to be granted custody of this child, …. With respect to her personal resources. To me, that's what we're talking about. What personal resources does she bring to the task of parenting and providing a supportive and functional household environment?
>
> There are two aspects of this that were assessed by me with her. One is her cognitive capabilities, and the other personal and parenting resources or skills and ability. And in regard to cognitive function, I completed an assessment in functional ability as well as a memory assessment. And the combined outcome of those place her intellectual ability at a border line level of functioning.

And I indicated in my report that this level of functioning is sufficient for her to recognize and to appreciate those—those decisions. Let me say it differently. She can recognize and appreciate the facts involved in making some decisions regarding her children. In that sense, she's competent.

My concern is that there are significant and psychological or psychiatric factors that interfere with her ability to bring forward this knowledge and to implement her knowledge and capability, her cognitive capabilities, to provide this kind of parenting and household environment that is necessary for this child.

Dr. Verna further testified:

my concern here is based on early spots to personality assessment and then subsequently to parenting assessment. And the question for me is, you know, what personal resources does one bring to bear on day-to-day problems?

And when I look at the results of the personality assessment, what I find is an individual with a defensive coping style who has—even for defensive people as indicated in the report, even for a defensive person who has issues that exceed that defensiveness of problems with suspiciousness and rigidity. Those are signs of depression and a poor sense of identity.

She describes herself as meek and unassertive. In stressful situations, she's a person who is somewhat self-critical, uncertain and just indecisive. These are what I would consider interfering factors, factors that interfere in the ability to make reasonable decisions or to take reasonable action in situations.

The behavior that I reviewed, through the clinical notes of Ridgeview, are consistent with this inconsistency of making appointments, keeping appointments. The repeated times when things weren't followed through. I think you can represent those things as sort of a historical factor in the last year, appear again in the personality assessment profile here.

\* \* \*

I completed a parenting assessment. And prior to doing these assessments, we had an interview period. And based on her responses and her optimism at parenting her youngest son, in that conversation, she had indicated she was asking for custody of her youngest son, but not the older son. . . .

She was optimistic about her parenting ability and her ability to provide a supportive household environment. When she completed this assessment, and I scored it, I was a little bit surprised to find that she had indicated— . . . [t]hese two sub skills suggest that she anticipates difficulty in managing behavior of her son. . . .

\* \* \*

In this case, it would imply that there's a good likelihood that she would perceive the child to be the problem in their conflicts. So that no situations where she's had difficulty with discipline can be seen as the child having problems as opposed to, again, her looking at her strategy or style of parenting as being problematic and needing to be changed.

When he was asked what happens when the two factors that he discussed, i.e., Mother's tendency to view the Child as the problem and Mother's tendency to shun conflict come together, Dr. Verna testified:

We have the perfect storm. . . . Let me tell you why. You have—there's one element that doesn't stand out. And that is you have a child who is growing and developing and increasing in skill.

In a household or potentially in a household with a parent with limited resources and a number of interfering factors that prevent her from implanting those cognitive resources that she does have access to.

My concern here that is what is going to happen is that this child in a very short period of time is going to exceed her ability. His ability will exceed her ability. And what will happen will be a struggle as to who will be ruler of the roost. Something that is not at all the problem.

My expectation is that what is going to happen is that as he gains more ability—in fact, if some of his skill is used to assist her in day-to-day activity, what's going to happen is that he is going to begin to be defiant. He is going to be controlling, and there's going to be conflict. And as a result of this conflict, I expect to (sic) pretty much the same as it was with the men in her life. He will be dominant and he will be physically and mentally controlling. And that's what I'm anticipating.

Dr. Verna testified further stating:

Everything that I've been allowed to review, to me, reveals a situation of an individual with limited resources with a lot of external resource and not a great deal of—how can I say this. A long history and a short past. A long history, and a lot of things in her life and childhood onward. A short past in terms of the outcome of all these systems that have been provided to her.

I don't see that there has been a significant change in her functioning. Over all these years, especially in the latter years of external resources, there being Wings, the day program being the exception, I think it's sort of outstanding in my mind that I don't see a significant

degree of increased ability to perform these tasks.

* * *

It's a repeated pattern that reflects the thing that I'm trying to say on the basis of her personality assessment. That she gets in situations where here's a person who has an ability to look and see that this may not be a good relationship. Somehow she ends up in these relationships. Somehow they all turn about (sic) to be about the same because she's being abused or the risk of abuse to her kids is—has been increased. I don't see that that pattern changed a great deal.

Now, in the last couple of years, I don't know a great deal about the men in her life. How many men there were. I do know that either through therapy notes there have been men in her life and that these relationships have been short lived to the extent that she's still making choices that she made in the past that place her children at risk.

Dr. Verna testified that Mother did not show up for the appointment that was arranged to allow Dr. Verna to observe the interaction between Mother and the Child. Dr. Verna also noted that "the thing that is outstanding in the review of her records from Ridgeview is that there were, in the last year, episodes of rank psychotic behavior, which they term hallucinations and at one point some delusions."

Donna Valandingham, a Department of Children's Services ("DCS") employee, visited Mother's home with another DCS employee in March of 2003 and took photographs that were introduced at trial. Ms. Valandingham testified about that visit stating:

we left the office around 8:00 a.m., and [Mother] was at home. We knocked on the door for several minutes. Like I said, it was early so we assumed she was

still asleep. Upon walking into the apartment, a strong odor of cat urine, just right off the bat. Some clutter in the kitchen. The cat's litter box was just corroded over with cat feces and that kind of thing.

Ms. Valandingham explained that some of the photographs showed several places in Mother's home where there was either cat vomit or cat feces and further testified that some of these spots were "more fresh than some of the other pictures . . ." and some spots were "more dried, kind of, like, smeared." Ms. Valandingham testified that some photographs showed "[f]rom the living room, we've got the garbage that's spilled. Cat food that's all over the floor." Ms. Valandingham testified that other photographs showed "a litter box in the kitchen by the dining room table, which is just full of cat feces. As you can [see] on the floor by the litter box, there is just a streak that goes pretty much across the tile that appeared to be cat feces from one side to the other." Further, Ms. Valandingham stated that in the bathtub in Mother's home "there was probably an inch or so or maybe more of stagnated water."

Ms. Valandingham looked in Mother's refrigerator and noted:

> There was food in the refrigerator. One of the mental notes that I made was that there was two half gallons of milk in the refrigerator. And I remember that this is March that we did the visit, and one of the half gallons of milk was dated in February and the other in January. So there was no fresh milk in the refrigerator.

Darlene Ellis, a former DCS case manager also testified at trial. Ms. Ellis was the first case manager assigned to the Child's case after he came into State custody. Ms. Ellis testified regarding her observations about Mother stating:

> Well, at first, she was, like, okay with it. [Mother] has always seemed like she was wanting to cooperate. She has always seemed that way. Willing to do the services and have services come into the home and willing to go to parenting classes.
>
> I mean, she's never said blunt "no." She's never said that. She's always tried to, you know, to do that. To comply with what the Permanency Plan says. . . . However, she's not always—I mean, Your Honor, how can I say this? She let services come in. And services will come into the house and they'll clean the house and stuff. But as far as keeping the house clean, keeping it that way, she don't. And her behavior over the years of constantly having services in the home or her taking parenting classes, going to Cornerstone and doing that, it's over and over again.

> &ast; &ast; &ast;

> She went to classes. She allowed Foothills to come in the home. She went to Cornerstone. She missed a couple, you know, but she did her services. She did what she was supposed to do. . . . . [But then] [i]t all blew up. . . . . Well, she would set up for me to go to her house because that was part of the thing was that I would allow [the Child] to go to the house if it was clean. The house had to be clean. And I would set up a time that we were going to be there at so and so time. I need to see the house before the visit happens. And she would say, 'Okay.[']

> I'd go up there and I'd sit, and I'd wait. And she wouldn't be there, and she wouldn't show up. Then I'd come back to the office and say, you know, she wasn't there.

Ms. Ellis testified:

While services was in the house, the house was clean. I mean, it still had the odor but as far as cat feces and stuff like that on the floor, no. It was good.

* * *

As long as there was services in the home, she done fine. But when services pulled out, she'd gradually go back down. She needed a crutch. She needed someone pushing her telling her you've got to do this. You've got to finish this, you've got to complete or clean up or whatever. She needed that push. And if she didn't have that push, she couldn't finish.

In addition, Ms. Ellis explained that although ETHRA was helping Mother to manage her money and pay the bills every month, Mother still wrote some bad checks that bounced.

Jim Pedigo, the president of Foothills Care Incorporated, a licensed child welfare agency that works with DCS to deliver social services and behavioral health services, also testified at trial. Foothills Care Incorporated provided homemaker services to Mother from July of 2002 through August of 2002. Mr. Pedigo testified:

our agency was called upon to provide two things. One was a curriculum of homemaker skill building activities where we worked with [Mother] to make sure that her house was able to be set up safe, sanitary.

And work with her on (sic) to just make sure she was linked with the agencies and services to help her be able to provide a functioning household..... Cleanliness, sanitary, having a budget, paying the bills, just all of the daily activities that would entail having an effective household.

* * *

[O]ur services were averaged one to two home visits a week for two to five hours each week of direct contact.

* * *

[S]ome of the earliest visits that we had after we did the assessment and identified—one of the first things that we identified was that the house needed work. It had an odor, from animal odor, and it just needed organization.

And so one of the first things we did in our early session was to rent a Rug Doctor and physically go through and clean the house. Rug Doctor it, and clean the upholstery and carpets together with [Mother]. But not only just doing that, but working with [Mother], helping teach her and talking all the time that we would go through doing that. Talking about here's the effect. Here's the advantage of being able to do that.

Mr. Pedigo stated that he does not know of any homemaker service that would continue in the home until a child turns eighteen if necessary. He stated: "I know there are targeted services that are provided to teach a skill that may be missing. And then that skill becomes in place. Then that person becomes self-sufficient. I think that's more the goal and the approach that's been asked of us anyway."

Sandra K. Buress from Reaches, a nonprofit organization with home visitation programs, also testified at trial. Reaches worked with Mother in the Natural Helper Program to work on budgeting, hygiene, and parenting skills. They also worked with Mother in the Parent Educator Program to give Mother direct assistance with the Child. Ms. Buress testified that Mother was moved into the Parent Educator Program because it offered more long-term assistance than the Natural Helper

Program, which typically lasts for only six months. In the Parent Educator Program, a parent can receive assistance until a child is five years old if they so wish.

Ms. Buress testified that from

December 10, 1996 to December 22, 1997 [Mother participated in] our Natural Helper Program.

Then we enrolled her in the [Parent Educator Program] from January of '98 to June of 2000. Then she went back into the Natural Helper Program from June, 2000 to February 2001. And then, at that time, she was closed due to lack of being able to keep appointments for visitation.... Well, when we do a home visit and if they have a phone, we usually call and say, 'You know, you're home and we're coming for a home visit.' And then the home visit varies. It's not for a set length of time. Normally, it depends on what we're talking about that particular day or whatever we need to work on.

But all the—I have documented—let's see. 'During January and February, 2001, the home visitor attempted to visit, and scheduled visits with [Mother] eight times. The case was closed due to client not keeping appointments for home visit.'

So the last time that I closed her was due to being unable to keep my visits with her. For instance, we need to visit, you know, at least touch base a couple of times a month. And when I would go out there, I would, like, leave a note on the door telling her that I had come by or to call me back. And it didn't come together.

Ms. Buress further testified:

[Mother] seemed to do better when it was, you know, sort of planned out for

her in steps, like, '[Mother], what you really need to do is focus on the kitchen today and try to clean it up.' She just seemed to do better when you specifically told her ... what she needed to do.... Sometimes when I'd make a home visit, the house was clean. And other times, it would be like she would lapse back. So not consistent.

James Nuchols, a DCS case manager and supervisor of foster care for Campbell County, testified:

Well, when we would get things started, [Mother] would make progress. And it would go on for a little while, and then all of a sudden, it would just drop due to noncompliance. She would not attend certain appointments. Different services would close her case due to noncompliance. We'd get frustrated, and we'd try to set up another kind of service. And we'd get about the same kind of luck with it, too.

After trial, the Juvenile Court entered an Order Terminating Parental Rights and Granting Guardianship on September 8, 2006, terminating Mother's parental rights to the Child and adopting findings of fact and conclusions of law as submitted by the State. Specifically, the Juvenile Court found and held [2]:

That [the Child] has been removed by order of this Court for a period of six (6) months; the conditions which led to his removal still persist; and other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to [Mother] in the

**2.** Citations to the record that appear within the Juvenile Court's findings of fact and con-

clusions of law have been omitted in this Opinion.

near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home; T.C.A. 36–1–113(g)(3).

In that, the evidence would show the following:

a. That the child was removed from [Mother's] home on October 26, 2001;

b. That the child was removed due to the ongoing neglect and inability to provide a safe, sanitary and stable home environment.

c. That it was alleged that the mother's own emotional condition was another condition which does persist and which in all probability would cause the child to be subject to further neglect and prevent the child's return to the mother;

d. That the history of mother's neglect and abuse relative to her other older children and the extensive history of services provided to the mother without the mother making a consistent improvement shows there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home, which is based on the length of time the Department has provided services and the other services available to the mother over the years.

d. (sic) That the mother received treatment and case management from Ridgeview Health Clinic and services from Wings, which addressed mental health and emotional issues of the mother.

e. That the mother received the following:

1. Foothills services home-maker program;

2. ETHRA services for homemaking skills, enrollment of mother in the Cornerstone Wings program; assistance with budgeting, psychological services for mother with Ridgeview, parenting classes with Reaches;

3. That through the years, the mother had a variety of services, at least from late 1980's thur (sic) 2002 (to the services in this case), which addressed parenting, housekeeping and care of the children.

4. That the mother ceased attendance of one of the support services, Cornerstone Wings in April 2003.

f. That the mother underwent psychological tests and specifically a parenting assessment conducted by Dr. Verna;

g. That the recommendation of Dr. Verna was that [Mother] did not have the ability required of her to be successful in parenting [the Child], who has special needs himself, and that her lack of ability was significant to the point she should not be granted custody of [the Child];

h. That Dr. Verna stated that the mother has significant psychological or psychiatric factors that interfere with her ability to follow through and provide the "kind of parenting and household environment that is necessary for this child."

i. That Dr. Verna considered the mother's individual traits and found there were "factors that interfere in the ability to make reasonable decisions or to take reasonable action in situations." Further, Dr. Verna noted that the mother's traits would create "the perfect storm" as to the difficulty of parenting [the Child], who has special needs.

j. That Dr. Verna cited the mother's inconsistency, failure to follow through with actions she knows to take and re-

sistance or inability to use resources to aid in parenting shortcomings. Further, he did not note that the mother has made a change in her pattern.

k.   That photos of the condition of the mother's home at the time of the removal were made exhibits and showed the extent of the environmental neglect.

l.   That the mother appeared to be evading the Department's attempt to make an announced home visit while the child was visiting the mother, according to the testimony of another case manager, Donna Valandingham.

m.   That case managers conducted a home visit in March 2003, after the above-cited incident, which revealed a continuation of unsanitary and unsafe conditions, according to the testimony from case manager Donna Valandingham.  Photos of those conditions were entered as exhibits.

n.   That the testimony of the case managers included descriptions of the strong odor of cat urine, the litter box being "corroded over with cat feces", clutter in the kitchen, cat vomit/or feces on carpet, some of which appeared dried, garbage spilled onto floor; clutter in the living room; inappropriate food stuffs, such as, Pediasure for a child [the Child's] age, and milk in the refrigerator in March with expiration dates of January and February, stagnated water in the bathtub, lack of adequate lighting upstairs, hot pans on the floor of the bedroom.

o.   That the mother had a history of moving 16 times since the sibling ... was three months old and at the time of the January 22, 29004, testimony, the mother had been in that present location approximately since September 2003; that there appeared to be two adults living in the two bedroom home.

p.   That the Foothills provider noted that it would recommend that the mother be able to show that she could provide a safe and sanitary home environment on her own without intensive support before the child would be returned to the home.

q.   That the March 2003 visit to the mother's home established that the mother's pattern of environment neglect continues and that, due to her own unresolved mental and emotional issues, in all likelihood will continue.

r.   That the mother admitted that older siblings had been taken from her home and returned but were removed again for environmental neglect and that [the Child] had been on a trial home placement.

s.   That the mother admitted she took an Order of Protection against one of her male acquaintances.

t.   That the mother admitted that she has Ridgeview Health as a "payee" over her benefits.

u.   That the mother stated another adult child lives in the two bedroom home with her at the time of the final hearing in May 25, 2006.

\* \* \*

That it is in the best interest of [the Child] and the public that all of [Mother's] parental rights to this child be terminated and the complete custody, control, and guardianship of [the Child] be awarded to the State of Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption *in loco parentis*.

Mother appeals the termination of her parental rights to this Court.

### *Discussion*

Although not stated exactly as such, Mother raises one issue on appeal, whether the Juvenile Court erred in terminating her parental rights to the Child.

■ As our Supreme Court has instructed:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn.2002) (citing Tenn.Code Ann. § 36–1–113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re: F.R.R., III,* 193 S.W.3d 528, 530 (Tenn.2006).

In *Dep't of Children's Servs. v. D.G.S.L.,* this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon,* 776 S.W.2d 96, 97 (Tenn.Ct. App.1988) (citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing

*Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn.Code Ann. § 36–1–113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn.1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn.Ct.App.1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn.Code Ann. § 36–1–113(c).

*Dep't of Children's Servs. v. D.G.S.L.,* No. E2001–00742–COA–R3–JV, 2001 WL 1660838, at *6 (Tenn.Ct.App. Dec.28, 2001), *no appl. perm. appeal filed.*

■ The Juvenile Court terminated Mother's parental rights pursuant to Tenn. Code Ann. §§ 36–1–113(g)(2) and (g)(3), which provide:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

\* \* \*

(2) There has been substantial non-compliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home....

Tenn.Code Ann. § 36–1–113(g) (Supp. 2006).

The State concedes on appeal that Mother's parental rights should not be terminated under Tenn.Code Ann. § 36–1–113(g)(2). Thus, the issue before us is whether the Juvenile Court properly terminated Mother's parental rights to the Child under Tenn.Code Ann. § 36–1–113(g)(3).

The record reveals that the Child had been removed from Mother's home for approximately five years prior to the entry of the final order in this case. Dr. Verna, who evaluated and tested Mother, testified in detail regarding his findings and stated that there were "significant and psychological or psychiatric factors that interfere with [Mother's] ability to ... provide this kind of parenting and household environment that is necessary for this child." Dr. Verna testified that Mother's tendency to view the Child as the problem and Mother's tendency to shun conflict combined to create "the perfect storm" in relation to parenting the Child. Dr. Verna also testified that he had seen no significant change in Mother's functioning over the years. In addition, several other witnesses testified that Mother was cooperative, but needed to be prompted constantly and specifically told what to do. These witnesses testified that Mother did fine when someone was watching over her shoulder, but that things went downhill as soon as Mother was not being constantly supervised.

The Juvenile Court found that clear and convincing evidence existed that the conditions which led to the Child's removal from Mother's home still persist and that other conditions persist which in all probability would cause the Child to be subjected to further abuse and neglect and that these conditions prevent the Child's safe return to Mother. The Juvenile Court further found that there is little likelihood that these conditions will be remedied at an early date so that the Child can be returned to Mother and that the continuation of the legal parent and child relationship greatly diminishes the Child's chances of early integration into a stable and permanent home. Specifically, the Juvenile Court found, among other things, that a home visit in March 2003 revealed a continuation of conditions that are unsanitary and unsafe for the Child, that Mother had taken an Order of Protection out against an ex-boyfriend, and that Mother had received numerous services throughout the years but had not demonstrated that she had made any change.

The evidence does not preponderate against the Juvenile Court's detailed findings. We, therefore, hold that the Juvenile Court properly found by clear and convincing evidence that grounds existed under Tenn.Code Ann. § 36–1–113(g)(3) to terminate Mother's parental rights to the Child.

The Juvenile Court also found that there was clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated. While Mother does not raise as an issue on appeal whether the Juvenile Court erred in finding that there was clear and convincing evidence that it was in the Child's best interest for her parental rights to be terminated, we will, nevertheless, address that issue.

■ The factors a trial court must consider when deciding whether the termination of parental rights is in the best interest of a child are set forth in Tenn. Code Ann. § 36–1–113(i). In relevant part, these factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has show brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn.Code Ann. § 36–1–113(i) (Supp.2006).

The above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest. *See State Dep't of Children's Servs. v. P.M.T.,* No. E2006–00057–COA–R3–PT, 2006 WL 2644373, at *9 (Tenn.Ct.App. Sept.15, 2006), *no appl. perm. appeal filed.*

After reviewing the applicable factors in light of the record and the facts as discussed above, we conclude that the evidence does not preponderate against the Juvenile Court's findings and conclusion that there was clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. We affirm the Juvenile Court's September 8, 2006 order terminating Mother's parental rights to the Child under Tenn.Code Ann. § 36–1–113(g)(3).

### Conclusion

The judgment of the Juvenile Court is affirmed as modified, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on

appeal are assessed against the Appellant,
B.J.N., and her surety.