# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 16, 2015

## IN RE K.G.S.

### Appeal from the Juvenile Court for Sevier County
### No. 14-000175          Dwight E. Stokes, Judge

### No. E2014-01299-COA-R3-PT-FILED-MAY 19, 2015

This is a termination of parental rights case focusing on K.G.S. (the Child), the minor daughter of K.G.S. (Mother).[1]  The Department of Children's Services (DCS) took emergency custody of the Child based on allegations of sexual abuse and lack of supervision.  The trial court adjudicated the Child dependent and neglected.  Both parents conceded the factual basis for this holding.  After a trial, the court terminated Mother's parental rights after finding, by clear and convincing evidence, that (1) grounds for termination were established, and (2) termination is in the best interest of the Child. Mother appeals and challenges each of these holdings.   We affirm.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Timothy J. Gudmundson, Sevierville, Tennessee, for the appellant mother, K.G.S.

Herbert H. Slatery, III, Attorney General and Reporter, and Rebekah A. Baker, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] The termination petition also named the Child's biological father, A.J.   He executed a surrender of his parental rights on the day of the trial.

## OPINION

### I.

In January 2012, Mother, then age seventeen, gave birth to the Child. After the Child's birth, Mother returned to the home of L.S. (Grandfather) and Z.S. (Grandmother), the Child's maternal grandparents (collectively, Grandparents). On November 30, 2012, DCS became aware of allegations that the Child had been sexually abused and was in need of supervision. On the same day, DCS conducted separate interviews of the parents. Mother reported that just before midnight on November 27, Father came to her home. When she opened her window to tell him to leave, he entered her bedroom, held her at "knifepoint" with a box cutter, and forced her to engage in sexual intercourse. The Child was nearby on a pile of dirty clothes. Mother stated that, on the same date, Father digitally penetrated the Child while changing her diaper. Mother did not report these two events to law enforcement until two days later. In his interview with DCS, Father admitted only that he was with Mother at her home. He said they had consensual intercourse. The trial court ordered that the Child be placed in the protective custody of DCS; the court stipulated that Father was to have no contact with the Child.

This was not DCS's first involvement with the parents; the department had received referrals regarding truancy issues with the parents in the past. Prior to the current events, a non-custodial permanency plan was in place pursuant to which DCS was making efforts to assist Grandparents in the supervision of Mother.

In December 2012, an initial permanency plan was established for the Child, under which Mother was required to: attend school and complete all homework; work with in-home service providers on parenting skills, education and therapeutic visitation; exercise regular visitation with the Child; follow all recommendations from a parenting assessment and a psychological assessment; obtain and maintain a safe and stable home; obtain and maintain stable, reliable income and submit proof of employment to DCS monthly; and obtain and maintain reliable transportation or submit an alternative transportation plan. As revised in May 2013 and again in August 2013, the requirements remained the same except for the requirement that Mother complete high school. This was removed after she dropped out of school. In March 2013, Mother was ordered to pay child support of $285 per month.

Following an April 3, 2013 hearing, the court adjudicated the Child dependent and neglected as conceded by both parents. In support of its order, the court found that Mother and Father had violated the no-contact order prohibiting Father from being around the Child. Further, the court found that Mother and Father had exchanged photos of the Child's vaginal area for prurient interest. The court determined that such conduct fell within the statutory definition of sexual exploitation of a minor. However, the court did

find that the State had failed to prove that Father digitally penetrated the Child, noting that "Mother's testimony has been inconsistent."

On February 14, 2014, DCS filed a petition to terminate Mother's parental rights. Four grounds for termination were alleged: abandonment by failure to support and by failure to provide a suitable home; mental incompetency; and substantial noncompliance with the permanency plan. A hearing on the petition was held on June 5, 2014.

Mother testified to the events prompting the Child's removal. She said she had tried to prevent Father from abusing the Child, but he had "shov[ed] his pinky up [the Child's] bottom." At a later date, she observed Father using her cellphone to take photos of the Child's vaginal area. Because of Father's violence toward Mother, Grandparents "kicked" him out of the house. Mother acknowledged there was a no-contact order prohibiting Father's contact with the Child, but she said Father ignored it. Mother conceded that she began seeing Father again in 2014.

Testimony by the Child's foster care case manager, Lynn Eggers-Bentley, was to the effect that Mother had failed to complete most of her responsibilities under the permanency plan. Since the Child was removed, Mother's circumstances were largely unchanged. At one point, Mother resorted to calling Ms. Bentley to say that she was "sick of all this" and "wanted her daughter back or she would have to take matters into her own hands." The proof generally showed that Mother was very dependent on Grandparents. She had recently obtained a driver's license, but continued to rely on Grandmother for transportation.[2] Grandfather explained that his eyesight was poor. Grandparents attended all DCS visits with Mother and often communicated, on Mother's behalf, with Ms. Bentley regarding the Child. Grandmother testified she received disability benefits for an anxiety disorder and was a self-described "slow learner." Ms. Bentley stated that she found Grandfather was best able to understand and communicate with her regarding the things Mother was required to do in order to regain custody. At the same time, Ms. Bentley stated that she did not consider Grandfather to be a "fit parent."

In November 2013, Mother moved to Florida. Mother testified she went to see a relative. According to Ms. Bentley, however, Mother explained that she moved to be with her boyfriend, K.Y., who went to Florida to live with an aunt after arguing with Grandparents and moving out of their home. Mother testified that while they dated, K.Y. had hit her in the stomach and slammed her against a wall. In January 2014, K.Y. contacted Ms. Bentley and informed her that he and Mother had returned to Tennessee and wanted to visit the Child. A visit was scheduled but canceled due to lack of transportation. Mother told Ms. Bentley that she wanted a relationship with K.Y., but she

---

[2] Grandfather's license had been suspended after he struck someone in an accident.

admitted that he had kept her from speaking about the Child with Ms. Bentley. Ms. Bentley had observed that K.Y. displayed a "very violent, rude, arrogant temper at times."

Dr. Bruce Seidner testified by deposition as an expert psychologist. Following an assessment of Mother, Dr. Seidner found that she was functioning at a mentally retarded level. He opined, to a reasonable degree of scientific certainty, that Mother "is significantly impaired and incompetent to such a degree that she could not be rehabilitated to parent a child independently."

At the time of the hearing, the Child was eighteen months old and had lived with her newest foster family for a few months. The Child was developmentally delayed and had "extraordinary" medical needs – she required occupational, physical, speech, and feeding therapy weekly. She also saw a neurologist and a pulmonologist for lung issues. The foster parents had two sons of their own and two other foster children in the home. Her foster mother testified that the Child called them "mommy" and "daddy." She said that the Child was loved by the rest of the family. The foster parents wanted to pursue adoption. During her visits, Ms. Bentley observed that the Child was "starting to attach" to her new home and foster parents.

Mother testified that she was pregnant by K.Y., but said they were no longer dating. Mother said she no longer had contact with K.Y., but then admitted she had communicated with him on Facebook within the past week. She said he had threatened her and their unborn child. Mother and Grandparents had not yet discussed a plan for protecting the unborn child from K.Y. Since returning from Florida, Mother had resumed living with Grandparents and began working at a Pilot convenience store.

Ms. Bentley stated that many of the permanency plan goals remained unmet, but she felt that Mother's lack of parenting skills was the primary concern. As to Mother's home, the yard had been mowed and some cleaning done around the porch, but wiring and other safety concerns were unresolved. Grandmother did not allow a scheduled "walk-through" of the home before trial and was absent at the time of the scheduled follow-up visit.

At the conclusion of the trial, the court ordered Mother's rights terminated. The court found that each of the four grounds alleged was clearly and convincingly established. Also by clear and convincing evidence, the court further found that termination of Mother's parental rights is in the best interest of the Child. Mother filed a timely notice of appeal.

II.

Before this Court, Mother essentially challenges the sufficiency of the evidence to support each of the cited grounds for termination as well as the trial court's decision

regarding the best interest of the Child.

## III.

With respect to parental rights termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011−00517−COA−R3−PT, 2011 WL 4553233 at *11−12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which judgments will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

## IV.

### A.

As earlier noted, the trial court found that clear and convincing evidence was

presented to support multiple grounds for termination. In this section of the opinion, we address each ground in turn.

B.

The trial court terminated Mother's rights to the Child based on its finding of two separate forms of abandonment pursuant to Tenn. Code Ann. § 36-1-113(g)(1) (2014), as further defined in Tenn. Code Ann. § 36-1-102 (2014). We begin with the finding of abandonment by non-support. As to this ground, "abandonment," in the case at bar, means that,

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, for purposes of establishing abandonment by failure to pay child support, the relevant four-month period is October 14, 2013 through February 13, 2014, this latter date being the day before the filing of the petition. Regarding a parent's child support obligation, this Court has observed as follows:

> Failure of a parent to pay support under the termination statutes is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." "The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations.... Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct."

*State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (internal citations omitted).

An interim hearing order dated January 2013 reflects that the trial court "explained to the mother and father the definition of abandonment for failure to visit and support and how those terms related to the termination of parental rights." At trial, the court expressly found that Mother abandoned the Child "in that [Mother] did not pay child support in the four (4) months immediately prior to the filing of the petition. . . ." The trial court acknowledged that Mother made payments from May 2013 until September 2013 and found that such payments "evidence[] her ability to earn income and to support." The court found that while "mother's employment might have been sporadic, she certainly had the means to provide some support or to attempt to provide some payments." The court pointed to evidence of Mother's work history, including positions at Pilot, Wilderness of the Smokies, and Texas Roadhouse. The trial court concluded as follows:

> There was no impediment or incapacity which prevented her from providing support in the four months preceding the filing of the Petition. . . . The Court further finds that her failure to provide support was willful. Mother certainly knew of her duty to support and the consequences associated with her failure to provide support. [Mother] signed a statement with the "criteria and procedures for termination of parental rights" on May 17, 2013.

In her defense, Mother argues that her lack of support cannot be deemed willful. She asserts that during the relevant months, she was in Florida, worked for a time for K.Y.'s aunt, believed she would be paid, and would have paid child support had she been paid. Mother's position is not persuasive.

The proof at trial showed that Mother was fully aware of her child support obligation as explained by DCS and also by the trial court at interim hearings. From May 10, 2013, to June 14, 2013, Mother made payments totaling $141.30. The payments were garnished from her wages while she was briefly employed at The Wilderness of the Smokies and Texas Roadhouse. In September 2013, she made one payment of $86.40, for a total of $227.70 when combined with her earlier payments. Show cause orders for non-payment were entered in January 2014 and March 2014. By the latter time, Mother was over $4,000 in arrears. Accordingly, her monthly payments were increased by $35 to $320, with the additional amount going toward the arrearage. Mother made no further payments until just before trial.

As to her time in Florida, Mother testified she went to visit her "pawpaw," but, at the same time, she admitted she stayed there with her then-boyfriend, K.Y., for several months and never saw her relative. Mother testified that she rode around with a photographer and

viewed houses for K.Y.'s aunt, a realtor, for two weeks but received no compensation for her time. By early January 2014, Mother had returned to Grandparents' home in Tennessee. She remained unemployed. Beginning in May 2014 and continuing to the trial date, Mother was employed at Pilot and payments of $73.84 were being garnished from her weekly wages. At trial, Ms. Bentley acknowledged that Mother appeared to be employed again, but noted that she had not provided pay stubs for her current or some other prior jobs.

The proof showed that Mother had knowledge of her duty to support the Child, and, her mental deficiencies notwithstanding, showed a demonstrated capacity to earn an income. As the trial court found, it appears she was focused on matters other than the Child and simply chose not to work and pay child support. In our view, the brief period she unintentionally worked without pay while in Florida does not excuse her failure to pay child support during the entire four-month period at issue. Mother did not resume working and making payments until months after the petition was pending. Concerning the termination proceeding, these latter partial payments avail her nothing. The law expressly provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child." Tenn. Code Ann. § 36-1-102(f).

The evidence does not preponderate against the trial court's finding of clear and convincing evidence that Mother willfully failed to pay child support. The trial court did not err in terminating Mother's parental rights on the ground of abandonment by willful non-support.

## C.

The trial court found clear and convincing evidence of abandonment by failure to provide a suitable home. As to this ground, "abandonment" occurs when,

> [t]he child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, . . . and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide

a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The trial court found that Mother "willfully failed to provide a suitable home for the child in that she has had the same unsuitable housing from the time of the removal through the filing of the Petition . . . to [the termination] hearing. . . ." The court continued:

> The evidence clearly and convincingly reflects that there are serious problems in this home, namely, sexual abuse, exploitation of this subject child, delays in reporting, and general environmental concerns. This is the home from which the child was removed and the home where the mother and her parents were not able to protect the child. At one time the mother left this home and went to Florida which evidences her lack of emphasis on the needs of this child. She seems to have done that in order to follow a boyfriend, which reflects her pattern of abusive relationships. Mother herself testified that the home is unsafe. The home still has unsafe aspects such as exposed wiring.

The Court further concluded that "[DCS] has made reasonable efforts on this matter, – and adds that those efforts exceeded the mother's."

At trial, Ms. Bentley described her visits to Grandparents' home. She testified that there were times when she was denied entry into the house. When she was allowed inside, she was limited to a front room. From there, she observed "deplorable conditions," with wirings hanging from outlets, piles of dirty clothes and expired cans of food visible. The proof showed that the family rented the house from the paternal great-grandfather who had refused to pay for any necessary repairs or otherwise make requested improvements. Ms. Bentley testified that Grandmother rejected her repeated offers to supply homemaker services and that she failed to take advantage of her offers to assist in finding suitable housing. Grandmother took the position that their home was "not a bad place to live," but acknowledged they were considering finding a new house. Grandmother testified that Grandfather had fixed the exposed wires "the other day." Grandmother admitted that the Child's paternal great-grandfather had threatened eviction as recently as a few days before

trial because of their failure to make the $400 monthly payment.

In the permanency plan, Mother was expressly tasked with providing the Child with a "safe, stable home free from abuse and neglect." At trial, she was questioned directly whether her home was a safe place for the Child. Mother testified, "To be honest with y'all, I really don't." Mother admitted there were exposed wires outside the home, and that other repairs were needed, but said the landlord had denied their requests for assistance. Mother was then working full-time earning $8 an hour. She felt she could obtain her own home, but conceded she had not tried to do so. Grandmother was doubtful that Mother could live on her own, and concluded "she might need a little bit of help on that."

To be sure, the evidence indicated safety hazards and environmental issues with Mother's home. The trial court implicitly found, however, that DCS's concerns regarding Mother's place of habitation involved much more than some exposed wires or expired cans of food. In our view, Mother's pattern of inviting manipulative, controlling, and abusive men into her home and life was at the heart of the problem. More than a year after the Child was removed, Mother was no closer to being able to provide her with a suitable home, *i.e.*, a safe, stable environment where she was not placed at risk by Mother's decision-making. Instead, in 2014, Mother had admittedly been with Father again. Further, she was expecting a second child with K.Y., whose presence might well adversely affect the Child's well-being.

For their part, Grandparents seemingly had little control over Mother and actually tended to enable her poor choices. This, coupled with Mother's inability to adequately care for and supervise the Child on her own, meant that Mother's decisions would tend to subject her and the Child to an unhealthy, unstable home. Grandfather admitted that he was concerned about the kind of men Mother dated. Further, he conceded that both Father and K.Y. lived in their home with Mother for a time even though he, Grandfather, did not like either of them. After Mother told them about Father's misconduct with the Child, they "moved him out," but Father kept coming around. Grandfather said that Father finally left, but added, "[o]nce you let them move in, it's hard to get them out unless they just decide to leave." Grandfather testified he worked a lot of hours and was not always around, but believed that Mother would be able to protect her children now that she was older. We disagree. We can only conclude that the proof established that there was simply no place for the Child in all of this.

The evidence does not preponderate against the trial court's finding that Mother failed to provide a suitable home for the Child at any point following the Child's removal. The trial court did not err in terminating Mother's parental rights based on her failure to provide a suitable home.

-10-

D.

The trial court found that Mother was mentally incapable of parenting the Child as provided in Tenn. Code Ann. § 36-1-113(g)(8)(B). That section provides, in relevant part, as follows:

> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii) That termination of parental or guardian rights is in the best interest of the child[.]

The statute further provides that, with respect to a finding of incompetency under Subsection (B), "no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]" Tenn. Code Ann. § 36-1-113(g)(8)(C).

In the present case, the trial court relied particularly on Dr. Seidner's psychological assessment of Mother. Based on the evidence at trial, the court concluded as follows:

> By clear and convincing evidence, the Court finds that [Mother] is incompetent to adequately provide for the further care and supervision of the [C]hild . . . because the parent's mental condition is presently so impaired and is likely to remain so and that it is unlikely that she will be able to assume the care of and responsibility for the [C]hild . . . in the near future. While the court may be generally reluctant to make a finding of this nature, the Court is today persuaded by this proof which is very strong.

The evidence preponderates strongly in favor of the trial court's finding that Mother is incompetent to parent the Child. Mother underwent a psychological assessment over

-11-

six sessions – the mental component of her court-ordered parenting fitness evaluation. Dr. Seidner supervised the administration and assessment of the Wechsler Intelligence scale and the MMPI.[3] In reviewing Mother's results, Dr. Seidner noted "cognitive weaknesses" and concerns about Mother's judgment. Overall, Dr. Seidner found Mother's intellectual abilities were in the bottom one percent of the population and concluded that Mother "meets the intellectual deficit criterion of mental retardation." He added that "she's got a developmental disorder of intellectual disability and that is not going to change." Specifically addressing Mother's parenting abilities, Dr. Seidner found that Mother's "ability to care for herself and function productively within a community is impaired," and it was "very unlikely she could independently care for a child." He further testified that were the Child to be in Mother's care, "[t]here's any number of ways that [Mother's] disability would impact the intellectual functioning of this child and the development of the child."

Other evidence at trial essentially corroborated Dr. Seidner's observations and conclusions regarding Mother's intellectual abilities. Mother has never demonstrated the ability to care for or support herself, much less a child; she relies on Grandparents in all aspects of her life. Moreover, she repeatedly exercised poor judgment with respect to her life decisions – to name a few, she became pregnant at seventeen; she had truancy issues before dropping out of high school; she repeatedly engaged in relationships with boyfriends who, by all accounts, were controlling, manipulative and abusive towards her; she was unable to shield the Child from sexual exploitation by Father or to report his conduct in a timely manner to authorities; and, while tasked with working to regain custody of the Child, Mother abruptly left the state and then became pregnant by another abusive boyfriend. While seemingly loving and well-meaning, Grandparents proved unable to steer Mother in a different, positive direction. Moreover, Ms. Bentley rejected the idea that Grandparents could assume custody of the Child instead of Mother. She testified that when the Child was removed from Grandparents' home, the department's investigation would have led DCS to remove Mother as well had it not been for the fact that she was turning 18 in a few weeks' time. In short, nothing in the proof persuades that Mother, with or without Grandparents' help, is mentally capable of providing the appropriate care and supervision that the Child requires. This is particularly true considering the Child's myriad health and medical issues.

There is clear and convincing evidence to support the trial court's finding that Mother is mentally incompetent to adequately parent the Child. The trial court did not err in finding grounds for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(8)(B). The evidence does not preponderate against the trial court's decision on this point.

---

[3] The Minnesota Multiphasic Personality Inventory, a broadband personality index.

## E.

Lastly, as to grounds, the trial court terminated Mother's rights based on its finding of clear and convincing evidence showing "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care." Tenn. Code Ann. § 36-1-113(g)(2). In particular, the court found that Mother largely failed to comply with "those reasonable responsibilities set out in the foster care plans related to remedying the conditions which necessitate[d] foster care placement." In particular, the trial court observed:

> From the earliest permanency plan, to the most recent plans, [Mother] was required to: follow through with counseling; maintain stable employment, stable housing. Mother has not substantially complied with these requirements. [M]other has a pattern of bouncing around with various boyfriends, repeating a pattern of abuse. At one time the mother even went to Florida with one such boyfriend, ostensibly to work. At the time of the hearing, she stated that this was to visit her Papaw, whom she had not seen in a long time. Her emphasis is on boyfriends rather than on her child.

In concluding, the trial court reiterated its finding that DCS's efforts to assist Mother with the plan's goal of reunification went unmatched by Mother.

At trial, Mother was questioned regarding the plan. She testified she had undergone a parenting assessment and added, "so I mean I've basically done everything DCS has told me to do." The record shows otherwise. Mother underwent a parenting assessment that included a psychological evaluation. She testified she also participated in some fifteen therapeutic visits designed to help with her parenting skills. Mother said that from these visits she learned how to feed and bathe the Child and change a diaper. Otherwise, Mother did not complete or maintain any progress with the plan's requirements – she failed to provide suitable housing, her employment was limited and sporadic, and she failed to pay child support as ordered. Most significantly, perhaps, there is nothing to suggest that Mother has obtained parenting skills that would enable her to provide appropriate care and supervision for the Child.

The evidence does not preponderate against the trial court's finding of Mother's substantial noncompliance with the terms of a permanency plan. The trial court did not err in terminating Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

## V.

Having affirmed the trial court's finding that grounds for termination exist, we next consider the issue of the Child's best interest. As we have noted, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven ─ "not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We are guided on our review by the list of non-exclusive factors enumerated in Tenn. Code Ann. § 36-1-113(i).   Those factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions, as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by

the department pursuant to § 36-5-101.

This Court has observed that "[t]he above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App. E.S., filed Sept. 15, 2006)).

In support of its best interest decision, the trial court stated:

> The child has been in foster care for approximately 18 months. The Court notes that in the home of the foster family, albeit for a brief time, the child is receiving the necessary love and care that's important for a child at this age, that the child has the ability[,] given this foster family's willingness to take this child in[,] to have a long and stable and productive home which a child of her age deserves.
>
> [M]other is not a bad person. Her employment outlook has improved and her father appears to be a good person who is trying to keep things afloat with his family. The maternal grandmother does the driving for the three of them but has no insurance. [M]other's parents recognize that the men with whom she has associated are not positive influences in her life. Having said these things though, the Court notes that [M]other's family has challenges.
>
> This child has significant medical problems which require a greater level of care than [M]other or her parents can provide. [M]other has shown a failure to follow through with permanency plan requirements and has not developed the ability to protect this child; [M]other may not ever do that. The Court also notes [M]other's running off to Florida which rendered her unable to reunify with her child. The Court can only conclude that she had a different emphasis than the best interest of this child.

The evidence does not preponderate against the trial court's findings. As properly viewed from the Child's perspective, the evidence clearly and convincingly establishes that her interests are best served by permanently severing Mother's parental ties and allowing

her to achieve permanency in a safe and stable home. We therefore affirm the trial court's best interest decision.

VI.

The judgment of the trial court terminating Mother's parental rights to the Child, K.G.S., is affirmed. Costs on appeal are taxed to the appellant mother, K.G.S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE