IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 2, 2016

IN RE M.E.T.

Appeal from the Juvenile Court for Shelby County
No. Z6581    Harold W. Horne, Special Judge

_____

No. W2016-00682-COA-R3-PT – Filed November 29, 2016
_____

The Department of Children's Services filed a petition in July 2015 to terminate the parental rights of M.G.H. (Father) with respect to his child, M.E.T. (the child).[1] The trial court found clear and convincing evidence of grounds supporting termination for Father due to abandonment by an incarcerated parent and persistence of conditions. The court also found, by the same standard of proof, that termination is in the best interest of the child. Father appeals. We affirm the trial court's holding as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed as Modified ; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H. DINKINS, and ARNOLD B. GOLDIN, JJ., joined.

Evan Williams, Memphis, Tennessee, for the appellant, M.G.H.

Herbert H. Slatery III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

Father and Z.P.T. (Mother) were never married. They were in a relationship from about 2009 until late 2012. The child was born in July 2013. No father was listed on his

_____

[1] The petition also sought to terminate the parental rights of the child's mother, Z.P.T. Her rights were terminated in an order entered February 15, 2016. The termination of her rights is not before us on this appeal.

birth certificate. After the child's birth, Mother left the hospital without the child. The trial court found her "mentally unstable," noncompliant with medication for her schizophrenia diagnosis, and without stable housing or child care equipment. In August 2013, the child was placed in the custody of DCS. He was adjudicated dependent and neglected that November.

At the outset of the case, Mother orally provided DCS with the name of the putative biological father. She did not provide any other credible information about him. She gave DCS two possible "endings" for Father's first name. A DCS caseworker recorded Father's first name as ending in "-ez" or "-el," though, as it turned out, it actually ends "-al." Equipped with the two wrong endings and nothing more, DCS was unable to locate Father. In 2014, a DCS caseworker by the name of Melissa Justice, by chance, saw Mother at a McDonald's restaurant. Ms. Justice testified that she verified Mother's identity, after which she engaged her in conversation. In the course of their discussion, Mother wrongly identified others at the restaurant as her children when they were not. Mother spoke with Ms. Justice about the child's twin – Maxwell. In fact, the child had no twin. Ms. Justice wrote her telephone number on a piece of paper and gave it to Mother, asking her to contact DCS regarding the child's case. She did not hear from Mother for some time. About a year later, the child's paternal grandmother contacted Ms. Justice. The grandmother provided DCS with the correct spelling of Father's name. DCS was finally able to identify Father in March or April of 2015.

On April 13, 2015, Ms. Justice met Father for the first time. At the time, he was incarcerated for assault. She testified that during the meeting she discussed with him the permanency plan and the criteria and procedures for termination of parental rights. By that time, two permanency plans had been developed, both of which listed an incorrect spelling of Father's name. Ms. Justice testified that at the April 2015 meeting Father "told [her] that he knew that [Mother] was pregnant and that she had named the baby [M]." At trial, Father denied having made that statement. Justice testified that the putative father registry revealed no other claims to paternity, no other man had held himself out as the father, and Mother had not identified another possible father. DCS arranged for Father to take a DNA test to address the issue of paternity. Father testified that he first learned of the existence of the child in April 2015. He said he did not know he was the father until he received the DNA test results in July 2015. On July 17, 2015, DCS filed a petition to terminate both parents' rights. DCS amended the petition in a filing on November 12, 2015. As to Father, the petition was amended to add the ground of persistence of conditions.

Father has an extensive criminal history. By the time of trial on February 4, 2016, he had not met or paid any support for the child. He was then out of prison and living

with his mother after a stint in a halfway house. The trial court found clear and convincing evidence of grounds to terminate Father's parental rights due to abandonment by an incarcerated parent, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) (2014) and -102(1)(A)(iv) (2014), and for persistence of conditions, pursuant to Tenn. Code Ann. § 36-1-113(g)(3). The trial court also found, by the same standard, that termination was in the child's best interests. Father appeals.

**II.**

Father raises two issues on appeal. (1) Whether the trial court erred in finding statutory grounds for termination due to abandonment and persistence of conditions. (2) Whether the termination of parental rights is in the best interests of the minor child.

**III.**

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing

*In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)).  "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."  *Id.* at 254.  The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child."  *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest.  *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.")

The Supreme Court has recently delineated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d).  Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise.  In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.  The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness.  Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted).  "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings."  *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034,

4

at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

## A.

Tenn. Code Ann. §36-1-113(g)(1) permits the termination of parental rights when abandonment occurs as defined by Tenn. Code Ann. § 36-1-102(1).  That statute provides that abandonment by an incarcerated parent occurs when:

> A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).  Father had been incarcerated since January 2015 at the time DCS instituted a termination action against him in July 2015.  Because Father was incarcerated when the termination proceeding against him was initiated, the definitions for abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(iv) apply.  As it relates to this ground, the trial court found:

> [Father] has abandoned the child in that . . . he willfully failed to visit and to contribute to the support of the child for four (4) consecutive months preceding incarceration.  [Father] has never visited [the child] or provided any support for him.  Additionally, [Father] has been repeatedly incarcerated for charges including assault, resisting arrest, and theft of property, and [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.  [Father] was arrested on January 28, 2014 for assault bodily harm, and [Father] pled guilty to that charge February 11, 2014.  [Father] was again arrested on March 31,

2014, for evading arrest and theft of property less than $500, and [Father] pled guilty to those charges on April 1, 2014. [Father] was again arrested on May 11, 2014 and served time in jail after pleading guilty to aggravated assault/reckless driving and intentionally evading arrest in an automobile on January 21, 2015. On September 1, 2015, [Father] was placed on an overnight hold in Germantown, Tennessee. Most recently, [Father] was arrested on September 8 and 9, 2015 for domestic assault-bodily harm and two counts of theft of property $500 or less. Family Service Worker Melissa Justice first met with [Father] on April 13, 2015, at which time[] [Father] informed her that he knew [Mother] was pregnant with his son and they were naming him [M.] Ms. Justice explained to [Father] the grounds that could result in termination of [Father]'s rights and presented him with a document []titled "Criteria and Procedures for Termination of Parental Rights." [Father] refused to sign the Criteria and Procedures for Termination of Parental Rights, and Ms. Justice left [Father] a copy of the document for his records. [Father] testified that he did not understand the document or any of the other documentation provided to him by Ms. Justice and believed that most of the documents dealt with [Mother]. On August 7, 2015, Ms. Justice again visited [Father] in jail, and at that meeting, [Father] changed his story and denied knowing about [the child] until Ms. Justice's visit in April 2015. [Father] was unable to request visitation upon his release from jail in August 2015, because he was again arrested on other charges in early September 2015. Despite [Father]'s testimony to the contrary, the Court makes a specific finding that [Father] knew about the child's existence from the time of his birth. (See Collective Exhibit 4, Criteria and Procedures for Termination of Parental Rights refused by [Father] and Affidavit of Efforts by Ms. Justice; Exhibit 7, Certified Arrest Records for [Father]; and Exhibit 8, Certified Criminal Records for [Father].)

Based on the above factual findings, the trial court held there was clear and convincing evidence that Father abandoned the child due to his failure "to visit or support the child for four months proceding [sic] incarceration and engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the child."

The evidence does not preponderate against the trial court's factual findings, though we make one distinction. The trial court's finding that "[Father] informed [Ms. Justice] that he knew [Mother] was pregnant *with his son* and *they were naming him* [M.]" differs from Justice's own testimony that "He told me that he knew that [Mother] was pregnant and that *she had* named the baby [M]." (Emphasis added.) Justice's testimony does not explicitly indicate that Father told her he knew Mother was pregnant *with his son*, only that he knew Mother was pregnant and what she had named the baby.

On appeal, Father denies that he could have abandoned the child pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv) because he did not learn the child was his biological son until July 2015. We agree that the "wanton disregard language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App., filed June 9, 2015). "[A] person cannot disregard or display indifference about someone whom he does not know exists." *Id.* Additionally, " '[f]*ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support*, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so.' " *In re Aiden W.*, No. E2013-01609-COA-R3-PT, 2014 WL 1682903, at *8 (Tenn. Ct. App., filed Apr. 28, 2014), *appeal denied* (July 14, 2014) (quoting *In re Audrey S.*, 182 S.W.3d at 864) (emphasis added). Therefore, to determine whether Father "abandoned" the child, we first must determine *when* Father learned of the child.

At trial, Father disputed Justice's testimony that at the April 2015 meeting he admitted to having had knowledge of Mother's pregnancy. However, we note that

> when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker,* 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.; see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)).

***State, Dep't of Children's Servs. v. Stinson***, No. W2006-00749-COA-R3-PT, 2006 WL 3054604, at *10 (Tenn. Ct. App., filed Oct. 30, 2006). Here, the trial court's order stated that "[d]espite [Father]'s testimony to the contrary, the Court makes a specific finding that [Father] knew about the child's existence from the time of his birth." The evidence does not preponderate against the trial court's finding that Father had known of the child's existence for the entirety of the child's life. We will apply this factual finding.

Father argues no contradiction exists between his claim that he was unaware the child was his son until he received the results of the DNA test and that he "could have been vaguely aware that [Mother] was pregnant but not that he was the father." However, it is significant that Father had knowledge at all times that Mother was pregnant following the conclusion of their multi-year romantic relationship. In the case of ***In re Chandler M.***, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App., filed July 21, 2014), we found grounds to terminate a father's parental rights based on actions he took after learning of the mother's pregnancy. In ***Chandler***, the mother told the father that the child was actually fathered by another man. ***Id.*** Still, this court found grounds to terminate the father's parental rights based on conduct he engaged in after becoming "aware that Mother was pregnant after he had sex with her." ***Id.*** In that case, we held that

> While Father was concerned enough to question if he was the [c]hild's father, he made no further inquiries as to his paternity after [m]other openly identified another man as the [c]hild's father. Instead, Father continued in his destructive behavior that demonstrated a "wanton disregard for his own welfare much less that of the [c]hild."

***Id.*** (Citations omitted.) Here, regardless of when Father verified his parentage, he knew Mother was pregnant after their romantic relationship ended. Therefore, for the ground of abandonment, we will consider Father's conduct during the entirety of the child's life.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) does not explicitly define wanton disregard, though "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." ***In re Audrey S.***, 182 S.W.3d at 867-68 (citing ***State Dep't of Children's Servs. v. J.M.F.***, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App., filed Jan.11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005)). "Parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration[.]" ***In re Kason C.***, No. M2013-

02624-COA-R3-PT, 2014 WL 2768003, at *5 (Tenn. Ct. App., filed June 17, 2014) (citing *State of Tenn., Dept. of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)). A parent's incarceration acts as a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

Prior to Father's incarceration – which began on January 2015 – he had been arrested several other times since the child's birth in July 2013. From December 2013 to January 2015, he was arrested five times for the following charges – vandalism; assault and bodily harm; driving while on a suspended license; disorderly conduct and evading arrest; and aggravated assault, intent to evade arrest, reckless driving, driving while license was suspended or revoked, and violation of financial law. As a result, he has been in and out of incarceration for most of the child's life. "[I]ncarceration severely compromises a parent's ability to perform his or her parental duties," and therefore " '[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.' " *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *9 (Tenn. Ct. App., filed May 28, 2014), *appeal denied* (Aug. 22, 2014) (quoting *In re Audrey S.*, 182 S.W.3d at 866).

Although wanton disregard considers a parent's conduct *prior to* incarceration, we also note that Father's behavior is part of a pattern of criminal conduct. His arrest record from Shelby County indicates that by the time of trial, he had been arrested fifty (50) times since 2004. This pattern continued in the months before the trial in this case. Father was released from prison in September 2015, soon after he received confirmation of his parentage. Within about a week of his release, he was incarcerated again following charges of domestic assault and bodily harm and theft of property of $500 or less. Even at trial, Father admitted that he had "smoked a little joint" about a month earlier and was unsure if he could pass a drug test. He testified that, "my system should be clear now, but I don't know." For the reasons stated above, we hold that Father's repeated acts of criminal – sometimes violent – behavior and multiple incarcerations during a time period when he knew of the child's existence establish, clearly and convincingly, that he abandoned the child by acting with a wanton disregard for the child's welfare.

In addition to "wanton disregard," Tenn. Code Ann. § 36-1-102(1)(A)(iv) provides two other definitions for what conduct by an incarcerated parent constitutes abandonment – willful failure to visit or willful failure to support the child *for four consecutive months immediately preceding such parent's incarceration*. A parent's abandonment for failure to visit or support must be willful. Tenn. Code Ann. § 36-1-102(1)(A)(iv). "Whether a

9

parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Aiden W.***, 2014 WL 1682903, at *8 (internal citation and quotation marks omitted).

It is undisputed that Father has paid no financial support for the child, nor has he ever given the child clothing, gifts, or other items. Tenn. Code Ann. § 36-1-102(1)(H) states that "Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child[.]" Father was born in June 1986. He has been older than the age of eighteen for all of the child's life. Therefore, he is presumed to have known of his duty to support his child. Still, he failed to do so. He testified that he did not know how to get items to the child. At trial, Father testified about his expenses and income. After being released from incarceration in November 2015, Father moved into a halfway house. By the time of trial, he was living with his mother. When asked at trial if he paid rent there he responded, "I pay some, but not the full amount." Father stated he earns income by taking odd jobs – cutting grass, "raking yards or detailing cars." He is not otherwise employed. He estimates he earned $200 in the month before trial. As far as his other expenses, Father pays $10 a month for his cellular phone bill and spends around $180 each month on groceries using food stamps. He has no car, instead relying on "[f]amily support" for transportation.

It is undisputed that at no point has Father visited the child. Ms. Justice testified that at times, Father had asked her "how his child was doing," but that he did not request visitation until the day before trial in February 2016. Ms. Justice testified that when she first met with Father in April 2015, "[w]e went over the permanency plan and I told him all of his action steps that were on the plan. And we went over the criteria and procedures for termination of parental rights." She testified that Father refused to sign these documents, which she recorded on the same. Ms. Justice testified that "I explained the documents to him and the jail guard signed as my witness." Ms. Justice also recorded her efforts to acquire Father's signature on the criteria and procedures for termination of parental rights in an Affidavit of Efforts. Under Tenn. Code Ann. § 37-2-403(B)(ii)(b):

> (ii) If the parents . . . of the child cannot be given notice to appear at the court review of the permanency plan, or if they refuse or fail to appear at the court review of the permanency plan, or cannot be found to provide notice for the court review of the permanency plan, any agency that holds custody of the child in foster care or in any other type of care and that seeks to terminate parental . . . rights based upon abandonment of that child under § 36-1-102, shall not be precluded from proceeding with the termination based upon

the grounds of abandonment, if the agency demonstrates at the time of the termination proceeding:

\*     \*     \*

(*b*) *By an affidavit, that the child's permanency plan containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition*, or that there was an attempt at any time to present the plan that describes the criteria for establishing abandonment under § 36-1-102 to the parents . . . at any time by the agency party, and that such attempt was refused by the parents[.]

(Emphasis added.) DCS met this obligation by meeting with Father and explaining to him the criteria and procedures to terminate parental rights and the permanency plan prior to filing the termination petition, and by memorializing those actions in an affidavit.

Despite knowing of the child, Father made no efforts to provide support, visit the child, or attempt to establish a relationship of any sort. Once DCS learned of Father's identity in March or April of 2015, they met with him to explain the permanency plan, his related action steps, and the criteria and procedures for terminating parental rights. He refused to sign these documents. DCS also arranged for Father to take a paternity test. At no point – including the four month period prior to his January 2015 incarceration – did Father make any effort to pay any sort of financial support for the child or give gifts of any sort. This continued even after he obtained the contact information for Ms. Justice, the DCS caseworker for the child's case. Additionally, at no point – including the four month period prior to his January 2015 incarceration – did Father visit the child. He did not request a visit with the child until the day before the February 2016 trial, at which time the child was approximately two-and-a-half years old. Based on this evidence, we find there is clear and convincing evidence that Father abandoned the child for willful failure to visit and failure to support, pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv).

11

**B.**

The trial court held that clear and convincing evidence exists to terminate each parent's rights based on persistence of conditions. Under Tenn. Code Ann. § 36-1-113(g)(3), termination of parental rights is authorized when:

> *The child has been removed from the home of the parent . . . by order of a court* for a period of six (6) months and:
>
> (A)   The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) . . . still persist;
>
> (B)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and
>
> (C)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

(Emphasis added.) However, on appeal, DCS concedes that the dependency and neglect order in the record only removed the child from Mother's custody, not Father's. DCS further concedes that because the child was not removed from Father's custody by court order, this ground is "inapplicable." Based on the plain meaning of the language in Tenn. Cod Ann. § 36-1-113(g)(3), we agree. *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *7 (Tenn. Ct. App., filed Feb. 27, 2015) (holding, in part, that where "the [c]hildren were not removed from [f]ather's home . . . the ground of persistence of conditions is not applicable to [f]ather"); *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *11 (Tenn. Ct. App., filed Apr. 1, 2013) (holding, in part, that "[t]here is case precedent to support [f]ather's position that, without removal from that parent's home, the ground of persistent conditions is inapplicable"). Therefore, we hold that the evidence preponderates against the trial court's finding that a ground exists to terminate Father's parental rights for failure to remedy persistent conditions. We modify

12

the order of the trial court to delete termination based on the ground of persistence of conditions.

**V.**

After finding a statutory ground warrants termination of Father's parental rights, we now consider whether the termination is in the child's best interest. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i):

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent . . . has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render

the parent . . . consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)).

In the present action, the trial court's February 15, 2016 order terminating the parental rights of Father held, by clear and convincing evidence, that termination of his parental rights was in the best interest of the child. The trial court found:

> Pursuant to T.C.A. § 36-1-113(i)(1), [Father] has not made an adjustment of circumstance, conduct, or condition as to make it safe and in the child's best interest to be in his home. [Father] has been in and out of jail for the majority of [the child]'s life, and although he has been out of jail for the past three months, that does not show a lasting adjustment of circumstances. [Father] has not shown any ability to parent [the child].
>
> Pursuant to T.C.A. § 36-1-113(i)(2), [Father] has failed to effect a lasting adjustment after reasonable efforts by the Department to the extent that lasting adjustment does not reasonably appear possible. [Father] has been in and out of jail during his short life, and the Department has done what it could to assist [Father], but he is not in a position to care for [the child] at this time.

14

Pursuant to T.C.A. § 36-1-113(i)(3), [Father] has never visited [the child].

Pursuant to T.C.A. § 36-1-113(i)(4), [Father] has no meaningful relationship with the child.

Pursuant to T.C.A. § 36-1-113(i)(5), a change of caretakers and physical environment would have a negative effect on the child's emotional, psychological, and medical condition. [Father] has no knowledge of [the child]'s special medical needs of severe eczema and possible asthma or how to care for his basic needs.

Pursuant to T.C.A. § 36-1-113(i)(6), [Father] has shown brutality toward adults as shown by his arrests for assault.

Pursuant to T.C.A. § 36-1-113(i)(7), there is criminal activity in [Father]'s home as shown by his arrests for assault, resisting arrest, and theft.

Pursuant to T.C.A. § 36-1-113(i)(8), [Father]'s mental and emotional status would be detrimental to the child and prevent him from providing safe and stable care and supervision for the child. [Father] reported that he probably could not pass a drug test on the day of the hearing and he would likely fail for marijuana. [Father] has also had several charges for assault against adults.

Pursuant to T.C.A. § 36-1-113(i)(9), [Father] has paid no child support for the child in accordance with the child support guidelines.

(Lettering in original omitted.) As to the child's current placement, the court found he has resided with foster parent J.H. and her husband, M.H., since September 9, 2013. The court stated in its order, "[J.H.] reported that [the child] calls [her] 'mom' and [M.H.] 'dad.' [They] have three other children, whom [the child] considers his siblings." The court also found the child "has severe eczema, allergies, and possibly asthma. He is currently on medication for allergies and the possible asthma." The evidence does not preponderate against the trial court's findings as it relates to the child's best interest or current placement.

In his brief, Father argues that after his release from incarceration, he did not have time "to accomplish several of the factors" in the best interest analysis. For instance, he argues that he did not have adequate time to make a "lasting adjustment" or "establish a meaningful relationship" with the child before the trial. But by the trial date, the child was two-and-a-half years old. Father had known of the child for all of the child's life. Still, he never visited or contacted him. Father had spent the years since the child's birth engaging in criminal behavior that resulted in multiple incarcerations, including once for assault against another family member in the home where Father was residing.

Father argues that Tenn. Code Ann. § 36-1-113(i)(9) "should not be considered in a best interest analysis since there is no order for child support consistent with Tenn. Code Ann. § 36-5-101." We disagree. As we stated, pursuant to Tenn. Code Ann. § 36-1-102(1)(H), Father, being over eighteen years of age, "is presumed to have knowledge of a parent's legal obligation to support" his child. Despite knowing of the child and of his duty to support, he failed to pay support at any time.

Ms. Justice testified that she discussed visitation with Father in going over the permanency plan and criteria and procedures for termination of parental rights. She testified that if Father had requested to visit the child while he was incarcerated she "would have arranged it." Father argues that DCS's effort to facilitate visitation between Father and the child "was lacking." However, Father did not attempt visitation until the day before trial. "[R]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *Stinson*, 2006 WL 3054604, at*15.

We note that "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d at 499 (citation omitted). We find it very compelling that the child has lived in the same foster home for nearly all of his life. He calls his foster parents "mom" and "dad." In the same home, there are other children who the child considers to be his siblings. His foster parents are familiar with his medical needs and treatment. Alternatively, Father and the child have never met. Their only bond is a biological one. The evidence does not preponderate against the court's finding that "a change of caretakers and physical environment would have a negative effect on the [C]hild[.]" For these reasons, we conclude, as a matter of law, the evidence clearly and convincingly establishes that termination of Father's parental rights is in the child's best interest.

## VI.

The judgment of the trial court is affirmed as modified. We modify the order only to vacate the holding that termination was proper under Tenn. Code Ann. § 36-1-

113(g)(3), failure to remedy persistent conditions. The costs on appeal are assessed to the appellant, M.G.H. This case is remanded for enforcement of the trial court's judgment, as modified, and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE