IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 5, 2018



IN RE E.M.

Appeal from the Circuit Court for Greene County
No. CC-17-CV53    Alex E. Pearson, Judge

_____

No. E2017-02304-COA-R3-PT

_____

The Department of Children's Services filed a petition to terminate the parental rights of L.B.M. (mother) and J.W.H. (father) with respect to their only child, E.M. The trial court found clear and convincing evidence for terminating mother's rights on the ground of severe child abuse.[1] By the same quantum of proof, the court found that termination of mother's rights is in the best interest of the child. Mother appeals the trial court's order terminating her rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H. DINKINS and KENNY W. ARMSTRONG, JJ., joined.

Whittney N.L. Good, Bulls Gap, Tennessee, for the appellant, L.B.M.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

Although present at the termination hearing, mother neither testified nor called any witnesses. Therefore, the following statement of facts is largely derived from the uncontradicted testimony of witnesses called by DCS.

---

[1] The court found multiple grounds for terminating father's rights and further determined that termination of his rights is in the best interest of the child. Father does not appeal the court's order terminating his rights.

On May 31, 2016, Detectives Chuck Humphreys and Buddy Randolph of the Greene County Sheriff's Department arrived at mother's home to conduct a welfare check. When they arrived, they observed emergency medical services already at the scene. Detective Humphreys testified that he encountered the child, mother, and a few other family members. According to Detective Humphreys, the child had burns on his hands and feet. Although mother would not discuss the child's burns, all other witnesses at the scene provided written statements. Based on his investigation, Detective Humphreys arrested mother and charged her with aggravated child abuse.[2]

Russell Clark, an investigator with Greene County Child Protective Services, also responded to the scene. Mr. Clark testified that when he asked mother about the cause of the child's burns, she said the child fell into a fire. According to Mr. Clark, mother claimed to have taken the child to Takoma Regional Hospital. Later that afternoon, however, Takoma informed Mr. Clark that it did not have records reflecting that the child was ever admitted. When Mr. Clark confronted mother with that information, she simply reasserted her claim and stated that she threw away the paperwork she received from the hospital visit. She also provided additional details about the cause of the burns. According to mother, two weeks prior to her arrest the child had fallen off her bed, stepped on a hot hair-straightening iron and then picked it up with his right hand.[3] Then, about one week later, mother said that the child burned his left hand by falling into a campfire.

Emergency responders transported the child to Johnson City Medical Center. Tessa Proffitt, a registered nurse who serves as the coordinator of the hospital's forensic program, examined the child and took photographs of his injuries. She later testified as an expert witness on behalf of DCS. According to Ms. Proffitt, the child had second-degree burns on both of his hands and another burn on the bottom of his right foot. She described the burns as "pretty significant in size" and remarked that the "scabbing is very deep." The child's left hand had burns on the palmar side of the hand extending from the webbing of his fingers down past his wrist. The child's right hand was burned on the pinky finger, ring finger, and part of the thumb. The burn on the thumb was linear in shape. The sole of the child's right foot contained a circular-shaped burn.

When asked whether it was possible that a straightening or curling iron caused any of the burns, Ms. Proffitt replied, "I don't foresee it being one of those things, especially on the left hand because of the webbing." She explained that if the child had picked up a

---

[2] The detective also charged mother with possession of drug paraphernalia, but mother was never prosecuted for that charge.

[3] Some evidence in the record suggests that the alleged cause of the child's burn was a curling iron, rather than a hair-straightening iron. The trial court determined that the difference between the two objects was insignificant.

straightening or curling iron, he would most likely have a linear, patterned burn across his palm. The burn on the child's left hand, however, was neither linear nor patterned; it also extended from the webbing of his fingers down to his wrist. The right hand had a linear burn on the thumb, but there were no burns on the palm. The burn on the child's foot was circular, rather than linear.

With respect to the alleged campfire incident, Ms. Proffitt said she would expect to see "burns to the forearms, to the chest, to the face, to the neck and the child didn't have those injuries." She did admit that it was "possible" that the burn on the sole of the child's right foot was caused by stepping on a hot coal. Ultimately, however, Ms. Proffitt concluded that she "would have to have more information about how the child would have fallen."

Finally, Ms. Proffitt testified that the child would "absolutely" have been in pain and that he would have required pain medication, such as prescription burn cream. She also emphasized that because infants have naturally unsanitary habits (such as sticking their hands in their mouths), there was an increased risk of the child developing an infection if the burns were left untreated.

On June 1, 2016, the child was taken to his primary care physician, Dr. Timothy Fuller. In a deposition, Dr. Fuller testified that the child's weight had significantly declined since his previous nine-month visit. The child weighed less than nineteen pounds, which placed him slightly below the third percentile. Dr. Fuller ruled out the possibility of disease and opined that the child's weight loss was due to "poor oral [food] intake, consistent with neglect."

Based on these facts, DCS filed a Petition for Order Controlling Conduct and For Protective Supervision in the Greene County Juvenile Court. On June 2, 2016, the juvenile court entered an order granting DCS temporary custody of the child. About one month later, DCS filed a motion for severe abuse. After conducting two hearings, the juvenile court entered an order declaring the child to be dependent and neglected and severely abused by mother. The decision of the juvenile court was appealed to the Greene County Circuit Court.

On February 7, 2017, DCS filed a petition to terminate parental rights as well as a motion to consolidate that petition with the appeal from the juvenile court. The trial court granted the motion to consolidate the cases. During the pendency of the termination proceedings, mother pled guilty to attempted aggravated child abuse. The plea agreement provided for a fifteen-year sentence with parole eligibility after serving thirty percent of the sentence. After three days of hearings on the petition to terminate, the trial court entered an order terminating mother's parental rights on the ground of severe child abuse. On November 14, 2017, the court entered an order that slightly amended its previous termination order. Mother appealed.

## II.

Mother raises the following issues, which we restate slightly:

>   Whether the trial court erred in finding clear and convincing evidence to terminate mother's parental rights on the ground of severe child abuse.

>   Whether the trial court erred in finding that clear and convincing evidence supports a finding that the termination of mother's rights is in the best interest of the child.

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. ***Stanley v. Ill.***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***Nash–Putnam v. McCloud***, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. ***In re Angela E.***, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (2017). Because termination proceedings are statutory, ***In re Angela E.***, 303 S.W.3d at 250; ***Osborn v. Marr***, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In the Matter of M.W.A., Jr.***, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. ***In re Angela E.***, 303 S.W.3d at 251 (citing ***In re Marr***, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." ***Id.*** at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's

rights is in the best interest of the child." ***In re C.B.W.***, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. ***In re Carrington***, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

***Id.*** at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." ***In re Adoption of S.T.D.***, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing ***Seals v. England/Corsair Upholstery Mfg. Co., Inc.***, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

Tenn. Code Ann. § 36-1-113(g)(4) (2017) (amended 2018) provides for termination of parental rights when "[t]he parent or guardian has been found to have committed severe child abuse . . . ." Our legislature has defined "severe child abuse" to

include:

> [t]he knowing exposure of a child to or *the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury* or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

Tenn. Code Ann. § 37-1-102(22)(A)(i) (2017) (emphasis added). Another statute provides that " '[s]erious bodily injury to the child' includes, but is not limited to, second- or third-degree burns . . . ." Tenn. Code Ann. § 39-15-402(d) (Supp. 2017) (emphasis added).

In this case, the trial court concluded that clear and convincing evidence supported termination on the ground of severe child abuse, as defined by the aforementioned statutes. The court stated that it considered the testimony of Dr. Fuller, the photographs of the child's injuries, the testimony of Tessa Proffitt, and the guilty plea to attempted aggravated child abuse. Based on that evidence, the court made the following factual findings: "there were second degree burns on the child," "any second degree burn is going to hurt whether you are a child or not," "the explanations that were provided to the detective and to DCS about how those burns happened were not consistent with the burns," and "the records [from Takoma Regional Hospital] were not provided because they do not exist."

The court concluded that if the child was truly injured in the manner alleged by the mother, then mother committed severe child abuse because she knowingly failed to protect the child from serious bodily injury. The court relied upon mother's guilty plea to attempted aggravated child abuse to support its conclusion that mother's failure to protect the child was "knowing."[4] The court also found it "most telling" that mother never sought any treatment for the child's burns in spite of the fact that the child must have been in pain.

Mother's brief includes one, short paragraph concerning the trial court's finding of severe child abuse. The paragraph simply observes that "[t]he burns were not infected"

---

[4] With regard to the guilty plea, the court stated that "an attempted aggravated child abuse cannot be an accident." The court acknowledged that

> there are different ways in which one can have an attempt, one of which is to help, aid, assist or attempt to aid somebody else in the commission of a crime . . . . [N]onetheless, a Class B felony pled outside the range for 15 years at 30 percent is a substantial extent, and a Class B felony is a substantial crime, and that is something that weighs heavily on the Court's mind.

and that "Dr. Fuller testified that second degree burns rarely leave scars, and further that the child would have full use of his hands." Mother also misconstrues the evidence by stating that "Ms. Tessa Proffitt testified that on the foot, she was unable to say if it was a burn or an abrasion that was healing." (In fact, Ms. Proffitt's confusion related to a mark on the *top* of the child's right foot. She was certain that there was a burn on the *bottom* of his right foot.) Mother's attempts to minimize the child's injuries are not persuasive. The evidence preponderates in favor of the trial court's findings that the child sustained second-degree burns, that those burns caused the child pain, and that mother failed to seek the appropriate treatment in spite of the child's pain and risk of infection.

We now consider whether the facts found by the trial court clearly and convincingly support termination on the ground of severe child abuse. First of all, second-degree burns clearly fall within the statutory definition of "serious bodily injury." Tenn. Code Ann. § 39-15-402(d). The dispositive question, therefore, is whether the facts as found by the trial court support the legal conclusion that mother knowingly failed to protect the child. Tenn. Code Ann. § 37-1-102(22)(A)(i). In a prior termination of parental rights case, we held that

> a person acts or fails to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at \*7 (Tenn. Ct. App., filed July 13, 2004).

Even accepting mother's version of events as true, it is clear that the child sustained the injuries while in the presence of the mother. That circumstantial evidence is sufficient to conclude that mother had "actual knowledge" of the relevant dangers to the child (i.e., the presence of the straightening or curling iron and the campfire). The fact that the child was severely burned on two separate occasions within a one-week period strongly suggests that mother recklessly disregarded those known dangers. Moreover, mother also failed to alleviate the child's ongoing pain by refusing to seek appropriate medical treatment. We hold as a matter of law that these facts clearly and convincingly support termination on the ground of severe child abuse.

## V.

### A.

Because at least one statutory ground warrants the termination of mother's rights, we now focus on whether termination is in the best interest of E.M. We are guided by the

statutory factors set forth in Tenn. Code Ann. § 36-1-113(i) (2017), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." **State Dep't of Children's Servs. v. B.J.N.**, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing **State Dep't of Children's Servs. v. P.M.T.**, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." **In re Marr**, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing **White v. Moody**, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

The trial court expressly considered the best interest factors listed above. The court determined that factors (4), (5), and (6) weighed in favor of a finding that termination of mother's rights was in the best interest of the child.[5]

With respect to factor (4), the court noted that, as a result of her incarceration, mother has not seen the child in over a year, making the development of a meaningful relationship impossible. Mother counters by arguing that she was "the primary caregiver and custodian for the minor child up until his removal" and that she developed a meaningful relationship with the child during that time.

We agree with the trial court that factor (4) weighs in favor of termination. Shortly after mother's arrest on May 31, 2016, a no-contact order was entered that prohibited mother from seeing the child. Although one DCS employee testified that mother frequently asked how the child was doing, there is no evidence that the no-contact order was ever lifted or that mother has seen the child since her arrest. Mother's counterargument is not persuasive because prior to her arrest, mother was responsible for severe child abuse and the child's malnutrition. Accordingly, the trial court correctly found that factor (4) weighs in favor of termination.

The court found that factor (5) weighed in favor of termination because of "the uncontroverted testimony [that] the child is doing well in his present foster home." Mother argues that this factor does not weigh in favor of termination because the child

---

[5] In her brief, mother argues that because she was incarcerated the court should not find that factors (1), (2), and (3) weigh in favor of termination. We find it unnecessary to address that argument because a careful reading of the trial court's order reveals that the court only considered factors (4), (5), and (6) to weigh in favor of terminating mother's rights.

had only been in his current foster care placement for two months prior to the termination order. The preponderance of evidence, however, supports the trial court's finding. A DCS caseworker testified, without contradiction, that the child was "doing very well" in his current foster home and that his current foster parents hope to adopt him. The caseworker also emphasized the child's rapid improvement in the new foster home:

> [E.M.] is doing great in the new foster home. He's been there for approximately going on two months. He is thriving. He is learning about the communication skills over what he had. He is in a new daycare at the church that the family goes to. The family has him in the community. They've had family in different states. So they like to keep him in a very family-oriented area. He has changed so much just in these couple of months even from the previous foster home. He is just opening up. He is just – I can't tell you how great he is doing there.

The child's guardian ad litem similarly stated that "the child is very bonded to the current custodians. He's in a good spot, and based on everything that has been testified to in the last three hearings, it would be in his best interest if the parents' parental rights were terminated and he could move forward to permanency." Given this uncontradicted testimony, we conclude that the trial court correctly found that factor (5) weighs in favor of termination.

The trial court found that factor (6) weighed in favor of termination because of the court's factual findings that mother was guilty of severe child abuse as well as the child's malnutrition. On appeal, mother simply "submits that there was no severe abuse committed by [mother]." For the reasons set forth in Part IV of this opinion, we do not accept mother's conclusory assertion. The trial court correctly concluded that factor (6) weighs in favor of termination.

Because factors (4), (5), and (6) all heavily weigh in favor of termination, and because the other factors are either neutral or inapplicable, we hold as a matter of law that there is clear and convincing evidence that termination of mother's parental rights is in the best interest of E.M.

## VI.

The judgment of the trial court is affirmed.  The costs on appeal are assessed to the appellant, L.B.M.  This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE